604 F.2d 121
 UNITED STATES of America, Appellee,
v.
Leroy BARNES, a/k/a "Nicky", Steven Baker, a/k/a "Jerry",
Steven Monsanto, a/k/a "Fat Stevie", John Hatcher, a/k/a
"Bo", Joseph Hayden, a/k/a "James Hayden", a/k/a "Freeman
Hayden", a/k/a "Jazz", Wallace Fisher, Leon Johnson,
a/k/a"J.J.", Waymin Hines, a/k/a "Wop", Leonard Rollock,
a/k/a "Petey", James McCoy, Walter Centeno, a/k/a "Chico
Bob", Defendants-Appellants.
 Nos. 1045-1053, 1056, 1057; Dockets 78-1040, 1045, 1050,
1051, 1056, 1058-1061, 1063, 1067.
 United States Court of Appeals,
Second Circuit.
 Argued June 22, 1978.
Decided April 23, 1979.
Rehearing and Rehearing En Banc Denied June 18, 1979.
Dissenting Opinion June 22, 1979.
 
 Robert B. Fiske, Jr., U. S. Atty., S. D. New York, New York City (Thomas H. Sear, Robert B. Mazur, T. Barry Kingham, Lawrence Pedowitz, Richard D. Weinberg, Robert J. Jossen, Asst. U. S. Attys., New York City, of counsel), for appellee.
 Edward M. Chikofsky, New York City (David Breitbart, H. Richard Uviller, New York City, of counsel), for defendant-appellant Barnes.
 Michael Young, New York City (Goldberger, Feldman & Dubin, New York City, of counsel), for defendant-appellant Baker.
 Mel A. Sachs, New York City, for defendant-appellant Monsanto.
 Helene M. Freeman, New York City (Robert Koppelman, New York City, of counsel), for defendant-appellant Hatcher.
 Joel A. Brenner, East Northport, N. Y., for defendant-appellant Hayden.
 Mark Lemle Amsterdam, New York City, for defendant-appellant Fisher.
 Joseph T. Klempner, New York City, for defendant-appellant Johnson.
 Mark S. Arisohn, New York City, for defendant-appellant Hines.
 Melvyn Schlesser, New York City (Bobick, Deutsch & Schlesser, New York City, of counsel), for defendant-appellant Rollock.
 J. Jeffrey Weisenfeld, New York City (Steven M. Jaeger, New York City, on the brief), for defendant-appellant McCoy.
 Barry Bohrer, New York City (Bohrer & Ullman, New York City, of counsel), for defendant-appellant Centeno.
 Before MOORE, VAN GRAAFEILAND and MESKILL, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 Leroy ("Nicky") Barnes, Steven Baker, Steven Monsanto, John Hatcher, Waymin Hines, Leonard Rollock, James McCoy, Walter Centeno, Leon Johnson, Joseph Hayden, and Wallace Fisher appeal from judgments of conviction entered on January 19 and 23, 1978, in the United States District Court for the Southern District of New York after a ten-week trial before the Honorable Henry F. Werker, District Judge, and a jury. The defendants were convicted of conspiracy to violate the federal narcotics laws, in violation of 21 U.S.C. § 846, and of various substantive violations thereof (21 U.S.C. §§ 812, 841(a) (1), and 841(b)(1)(A)). In addition, defendant Barnes was convicted of engaging in a continuing criminal enterprise involving narcotics, in violation of 21 U.S.C. § 848, and defendant McCoy was convicted of unlawful possession of a firearm during the commission of a federal felony (18 U.S.C. § 924(c)(2)).
 
 
 2
 Those defendants who appeal have submitted a Joint Brief (J.Br.) of 94 pages and a reply brief of 71 pages covering common issues on appeal. In addition, separate briefs have been filed by individual appellants as to issues that apply more particularly to them. In view of the complexity of the issues raised on appeal, we set forth a summary of the charges in the indictment, insofar as it relates to appellants, followed by a brief chronological sketch of the narcotics investigation which led to the instant prosecution, the facts of which were presented to the jury during the ten weeks of trial.
 
 THE INDICTMENT
 
 3
 Count ONE charged a conspiracy by Barnes, Baker, Monsanto, Hatcher, Hayden, Wallace Fisher, Hines, Rollock, McCoy, and Centeno to violate the narcotics laws of the United States, 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A), 846. The object was the possession and distribution of heroin and cocaine. Thirty-three overt acts were alleged. Additional defendants named in this count included Guy Fisher, Gary Saunders, Wayne Sasso, and Brenda Sasso. The jury failed to reach a verdict as to Guy Fisher. Saunders and Wayne Sasso were acquitted. The charge against Brenda Sasso was dismissed by the court.
 
 
 4
 Count TWO charged Barnes with operating a "continuing criminal enterprise" to violate 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) in concert with five or more other persons with respect to whom he occupied a position of organizer, supervisor, or manager, and from which enterprise he obtained "substantial income or resources". 21 U.S.C. § 848.
 
 
 5
 The Substantive Narcotics Violation Counts 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2
 
 1. The Heroin Charges
 
 6
 Count THREE charged Barnes, Baker, Monsanto, McCoy, and Fisher with possessing and distributing approximately 445 grams of heroin on or about December 29, 1976.
 
 
 7
 Count FOUR charged Barnes, Hatcher, and Fisher with possession and distribution of approximately 457 grams of heroin on or about March 11, 1977.
 
 
 8
 Count FIVE made the same charge against Barnes, Hines, and Centeno, the date being on or about March 14, 1977, and the amount being 892.7 grams.
 
 
 9
 Count SEVEN charged Baker and McCoy with possession and distribution of some 191 grams of heroin on or about March 1, 1977.
 
 
 10
 Count ELEVEN charged Barnes, Rollock, and Fisher with possession and distribution, on or about November 29, 1976, of 107.6 grams of heroin.
 
 2. The Cocaine Charges
 
 11
 Count TWELVE charged Johnson with possession and distribution, on or about December 4, 1976, of some 24.1 grams of cocaine.
 
 
 12
 Count THIRTEEN charged Johnson with possession and distribution of 99.5 grams of cocaine on or about December 14, 1976.
 
 The Firearms Violations
 
 13
 Count EIGHT charged McCoy with carrying a firearm, on or about March 15, 1977, during the commission of a federal felony, in violation of 18 U.S.C. § 924(c) (2).
 
 
 14
 In addition, McCoy and Centeno were charged with separate firearms violations. Count SIX, in which Centeno was charged, was dismissed at the close of the Government's case. The jury acquitted McCoy under Counts NINE and TEN.
 
 THE INVESTIGATION
 
 15
 Apparently as a result of a New York State narcotics investigation, Inez Smart, a narcotics "activist", was arrested in March 1977. She agreed to cooperate and testified at trial. Her testimony, in substance, was that, in October 1974, she had met the defendant Barnes through a Richard Smith; that Barnes had desired to purchase quinine (a narcotics cutting material) in large quantities ($150,000 worth a month) at $25 an ounce; and that, upon delivery of 1000 ounces, Smith and Barnes had paid her $25,000. Further quinine transactions took place during 1975.
 
 
 16
 In December 1974 police officers stopped a Mercedes Benz leased by Barnes from Hoby Darling Leasing Corporation and driven by Barnes. Richard Smith and one Robert Monroe were passengers. In the trunk of the car the police found over $132,000 in cash, mostly small bills.
 
 
 17
 In November 1976 the Drug Enforcement Administration (DEA), in an effort to uncover sources of drug traffic in Harlem and the South Bronx, enlisted, for a financial consideration and witness protection, the services of Robert Geronimo. He had grown up in the South Bronx and was friendly with many of the defendants. Geronimo also was familiar with the Kingdom Auto Leasing Corporation in the Bronx, owned by Guy Fisher and apparently used by the Barnes organization narcotics dealers to avoid car forfeiture if narcotics were found therein.
 
 
 18
 In November 1976, Geronimo, in an effort to infiltrate what was believed to be the Barnes organization, called upon Wallace Fisher, a younger brother of reputed Barnes confederate Guy Fisher, in an endeavor to enlist his services. At about this same time, undercover agent Louis Diaz of the DEA appeared with money to make substantial purchases. Geronimo represented Diaz to Wallace Fisher[1] as his Italian cousin with money to make narcotics purchases.
 
 
 19
 On November 29, 1976, for the sum of $8,300 ($8,000 for the narcotics and $300 for Fisher), one-eighth of a kilogram of heroin was sold by Rollock to Geronimo and Diaz. This transaction formed the basis for Count ELEVEN of the indictment. Rollock and Fisher were convicted on this charge; Barnes was acquitted.
 
 
 20
 "Money-washing" is apparently an important step in the narcotics business. It involves the conversion of many small bills into larger denominations. In mid-December 1976, at the Hubba Hubba Social Club in Harlem, Barnes asked Fisher whether he and Geronimo could handle a "wash". This was accomplished at a downtown bank by Diaz and Wayne Sasso (who was acquitted of the conspiracy charge arising from this transaction). Defendant Hayden, when told of the success of the "wash", expressed his satisfaction with the operation.
 
 
 21
 Shortly thereafter, on an occasion when Barnes met Fisher at Bubba Jean's Emporium, Barnes asked Fisher why he (Fisher) and Geronimo had gone to Rollock; Barnes directed that, for any further deals, Fisher and Geronimo should see defendant Monsanto ("Fat Stevie"). A deal was consummated subsequently at the Harlem River Motors Garage, whereat Geronimo gave $21,000 to Monsanto, who in turn gave Geronimo one-half kilogram of heroin which, according to the conspirators, had come from defendant Baker. McCoy and Monsanto proceeded to count the money as Geronimo left the premises. Barnes, Baker, Monsanto, McCoy and Fisher were convicted for this transaction, which was Count THREE.
 
 
 22
 On about March 11, 1977, a sale of a half-kilo, at the price of $35,000 (as agreed between Hatcher and Geronimo), was made by defendant Hatcher, through Fisher, to Geronimo and Agent Diaz, delivery taking place at the Harlem River Motors Garage. The package containing the heroin had the name "Bo" (which was Hatcher's nickname) written on it. This transaction, the subject of Count FOUR, resulted in the conviction of Hatcher and Fisher; Barnes was acquitted, despite evidence to the effect that Barnes had been in the office area watching Diaz's comings and goings.
 
 
 23
 While Diaz and Geronimo were continuing their "infiltration" efforts, the DEA was attempting to find other means to obtain evidence. Hence, during late summer and early fall of 1976, the DEA enlisted the services of two additional informers, Promise Bruce and Robert Wooden. Bruce was in jail at the time he was approached, but was reputed to know Barnes, Johnson, Hines and Guy Fisher and to have discussed obtaining heroin with Barnes and Guy Fisher during 1974. After his release from prison, Bruce purchased cocaine from Johnson on about December 3 and 13, 1976. For these two sales Johnson was convicted under Counts TWELVE and THIRTEEN.
 
 
 24
 Later in December, Bruce proposed exchanging "cut" for heroin. On two occasions Bruce delivered samples of quinine and mannite (a cutting narcotic) to Johnson, to be taken by him to Barnes for his approval. Apparently the quinine was the wrong kind and the price was out of line. Further negotiations ensued, and in early February 1977 Bruce discussed such an "exchange" transaction directly with Barnes. When Hayden joined them, Barnes inquired as to the quantity of cut that Bruce had on hand. After hearing his reply and after asking Hayden about his (Hayden's) stock of "cut", Barnes told Bruce that they did not need any "cut" at that time.
 
 
 25
 Bruce continued to push his exchange program and, after unfruitful discussions with Monsanto, made a deal for the exchange of "cut" and cash for one-quarter kilo of heroin. The deal was consummated on or about March 1, 1977 by the delivery to defendants Baker and McCoy of some 44 kilograms of mannite and $2,000 for the one-quarter kilo. Baker and McCoy were both convicted on this count (Count SEVEN).
 
 
 26
 Bruce continued in his efforts to purchase heroin. In early March 1977, he met the defendant Waymin Hines, who agreed to sell 250 "quarters"[2] of heroin for $10,000 and to provide samples so that the weight and quality might be checked. Bruce then waited at Julia's Bar with DEA Agent Mary Buckley for delivery of the samples. Shortly thereafter defendant Walter Centeno arrived and gave Bruce two "quarters". The four Bruce, Buckley, Centeno and Hines left the bar and reassembled at an agreed-upon location, at which time $10,000 was given to Hines. Hines, in turn, designated the time and place of delivery of the 250 "quarters", which were delivered to Agent Buckley by Centeno, who gave his name as "Chico Bob". Hines and Centeno were convicted on this count (Count FIVE); Barnes was acquitted.
 
 
 27
 Wooden's testimony as an informer related to Monsanto and Baker. Wooden, posing as a customs agent in 1974, had met Monsanto. During the course of their friendship, Monsanto told Wooden that he (Monsanto) sold heroin. He asked whether it would be possible for him (Wooden), as a customs agent, to permit the importation of 300 pounds of heroin into the country. It was after this event that Wooden began to cooperate with the DEA. Wooden and Monsanto conducted business both in "cut" and heroin, Wooden delivering a case of "bonita" (a cutting material) to Monsanto for $700 and buying an ounce of heroin for $1500, the cash being paid to Monsanto at the Harlem River Motors Garage. Baker was present when the money was given to Monsanto, and was introduced to Wooden as Monsanto's partner. No charge was brought relating specifically to this transaction.
 
 
 28
 Other evidence included testimony of numerous conversations in which "Nicky" was referred to by Fisher and others, and general conversations regarding negotiations, unconsummated deals, and identifications of persons who arrived at various subject locations just before or just after a transaction was completed.
 
 
 29
 The jury began to hear evidence on September 29, 1977, before the Honorable Henry F. Werker. On December 2, after deliberations lasting three days, eleven defendants were convicted.
 
 THE ISSUES ON APPEAL
 I.
 
 30
 Appellants' opening and much stressed argument deals with the manner in which the court conducted the Voir dire examination of the potential jurors and its insistence on their anonymity. More specifically they claim that:
 
 
 31
 "The district court's refusal to disclose petit jurors' identities, residence locales or ethnic backgrounds and the court's restrictive voir dire denied defendants due process." (J.Br. 5).
 
 
 32
 They also assert as reversible error the court's failure to inquire into the religion of each prospective juror. Using as their authority Clarence Darrow, who believed that a juror's "nationality, his business, religion, politics, social standing, family ties, friends, habits of life and thought; the books and newspapers he likes and reads . . . (even to his) method of speech, the kind of clothes he wears, the style of haircut . . .", were important subjects for questioning, they contended that the court's inquiry was unduly (to the point of reversal) restrictive. (J.Br. 5, Quoting Darrow, Attorney for the Defense, Esquire Magazine, May 1936). Substantially before Darrow, even Blackstone, also quoted by appellants, said: "The peremptory challenges of the prisoner must however have some reasonable boundary." 4 Blackstone 347 (1769). Appellants themselves recognize this limitation, saying: "(I)t is not asserted that defendants ordinarily are entitled, in each and every case, to Voir dire prospective jurors on their ethnic or religious backgrounds"; but they claim "at the very least, their 'neighborhood' or township within the County" should have been disclosed, and that, if names and addresses were properly withheld, then the court should at least have inquired about prospective jurors' ethnic background in order to facilitate the intelligent exercise of peremptory challenges. (J.Br. 12 n.*).
 
 
 33
 In view of the challenge to the jury selection procedure adopted by the district court, a review of the some 524 pages of the transcript covering the Voir dire must be made. There were 15 defendants. All but one, a Hispanic, were black. The charges were serious the distribution of massive quantities of narcotics on the streets of Harlem and the South Bronx from which enormous profits were realized an operation which had continued over a period of years. There had been much pre-trial publicity, particularly centering around the activities of the alleged ringleader, the defendant Barnes. Further, the "sordid history" of multi-defendant narcotics cases tried in the Southern District[3] was sufficient to put the trial court on notice that all safety measures possible should be taken for the protection of prospective jurors, including complete anonymity, namely, no disclosure of name or address. In addition, their rights of privacy had to be respected except insofar as their views might relate to the specific charges to be submitted to them.
 
 
 34
 The court called 150 potential jurors. To each was assigned a number. Individual examination followed to winnow out for cause. The court had received in advance from both Government and defendants alike lengthy lists of questions which they requested the court to ask the prospective jurors. The Government submitted 45 questions; respective counsel for Barnes, Hayden, and Fisher, 108, which included questions relating to their general attitude towards black people and their feelings towards them.
 
 
 35
 The substance of these many requests, with the exception of ethnic background and religion, were embodied in the court's questions. None of the crimes charged related to any specific ethnic background, nor to any religion. Rather, they concerned simply allegations of narcotics trafficking committed by blacks. Potential prejudices in these fields were fully covered by the court.
 
 
 36
 The court first addressed a number of questions to the entire panel. These questions included the usual questions pertaining to whether the prospective jurors knew any of the alleged participants or attorneys involved in the case; whether they could accept and apply the law as instructed by the court; whether they had any feelings about undercover agents, paid informants, or electronic surveillance which would prevent their fair judgment of the case; whether they, or close friends or relatives, had had any prior experiences with narcotics or with firearms which would prevent fair consideration of the case; whether they had seen or read anything that would influence their judgment; and whether they would be able to sit during a rather lengthy trial. The entire panel was also asked to make known to the court whether they had ever had any contact with any individuals or businesses which would be referred to during the trial, including the Harlem River Motors Garage, various social clubs, and various persons, including even the doorman at the Hubba Club. The list was quite lengthy, but only two responded that they, or their friends or relatives, had knowledge of the named persons or places.
 
 
 37
 After many prospective jurors were excused for cause, the court addressed the following types of questions to the individual prospective jurors. All jurors were asked the county of their residence, and the length of time they had resided in that county. Family history was elicited: each prospective juror was asked about marital status and whether he/she had any children. Furthermore, each was asked about his or her own occupation and, if he or she had a family, about the occupations of spouse and/or children.
 
 
 38
 All prospective jurors were also asked about their educational backgrounds, and about membership in any organized group, club, or fraternal organization.
 
 
 39
 Each was also asked whether he/she or close friends or relatives had ever had dealings with agents or officers of the DEA, the New York Drug Enforcement Task Force, the New York City police, or any agency of Government dealing with narcotics; if there was an affirmative response, the prospective juror was asked whether the previous contact had created any opinion. All prospective jurors were also asked about any family member's or friend's employment with the Federal Government or with any federal or state investigating agency, etc., which could support a tendency to favor the Government. Furthermore, each was asked whether he/she had any opinion about the courts, defense attorneys, prosecutors, and/or law enforcement officers, that would prevent fair judgment of the case, and whether he/she had been involved in any suit with the United States; whether he/she or a friend or family member had ever previously been a juror or had ever been charged with a crime or been under subpoena, or had ever been a complainant.
 
 
 40
 All were asked about health problems, including potential family health problems. Further, all were asked whether they had previous knowledge of the indictment, and whether they had read anything about the case.
 
 
 41
 Specific questions concerning attitude toward blacks were addressed to each juror as well.[4] The court first asked what the prospective juror's "general attitude toward blacks" was; to further probe, the court then asked whether the prospective juror had ever moved to a different area because he/she had been disturbed by changing conditions. The court asked whether the prospective jurors had had any experience with persons of other races, creeds, or colors resulting in civil or criminal confrontations, or whether he/she had ever had any experiences with persons of different races arising out of employment, residence, or school situations, which might make the juror feel that he/she could not fairly judge such persons. Most were also asked whether they felt that they were generally prejudiced against persons of other races.
 
 
 42
 There were many instances in which the prospective jurors admitted some prejudice or tendency to favor the Government, and they were excused. (E. g., Tr. 144, 193, 196, 197, 384, 435). Several admitted that they had moved because of "changing conditions" in their neighborhoods. (E. g., Tr. 329, 338, 382, 470 (because of narcotics entering neighborhood)). Several admitted some prejudice against blacks. (E. g., Tr. 385, 448, 499). These were excused. Further, after the panel was sworn, and before the alternates were selected, juror No. 5 told the court that he had been mugged on his way home the previous night by a black person, and he admitted that he could no longer be fair to black persons. He was excused, and alternate No. 1 became juror No. 5. (Tr. 571-72). Moreover, after being selected, alternate No. 3 recalled a situation which, the juror decided, prejudiced him, and he was excused. (Tr. 499). In sum, the court conducted a Voir dire which resulted in the selection of a panel whose background was fully explored, and whose state of mind with respect to the racial "question" was probed as well.[5]
 
 
 43
 Although the court specifically disclaimed that any threats had been reported in this case (Tr. 291), there were instances, brought up during the Voir dire, that indicated that some threats may have been made in the case.[6] For instance, it was reported (Tr. 283) that the Marshal's office, which had the Government's witness Geronimo in protective custody, was called by an anonymous caller who allegedly said, about Geronimo: "If he does anything, he'll be dead". This threat was reported to the court.
 
 
 44
 During the Voir dire, the court indicated its concern with the "irresponsibility" of the press. After the court's decision to sequester the jury was announced (and the decision to withhold names and addresses), the New York City afternoon paper came out with an article which suggested that there had been specific threats. The court acknowledged later that afternoon that there had been none (Tr. 370-72), suggesting that the press had irresponsibly attributed such a statement to him when, in fact, a statement about the Possibility of threats had been made at some earlier proceeding by an Assistant United States Attorney.
 
 
 45
 Other problems in insulating the jurors occurred. For example, at one time defense counsel called to the court's attention the fact that there was a "psycho" sitting among the prospective jurors who had been talking to them about Barnes. The court's solution, short of excluding spectators was to have prospective jurors sit on one side of the room, and spectators on the other. (Tr. 373-75).
 
 
 46
 The court's attitude was expressed at the beginning of the Voir dire :
 
 
 47
 "It is imperative in a case of this importance that nothing be allowed to occur which might interfere with this jury's impartial and objective study of the evidence and the application of the law.
 
 
 48
 "As a consequence, in the interest of protecting the privacy of the jurors and their families and saving them from the resultant embarrassment should any such incident occur (having just discussed media interviews), I have elected to maintain the anonymity of the jurors. This will insulate the jurors and their families from such possible inquiries on the one hand and on the other permit the media complete freedom of coverage of this trial." (Tr. 17).
 
 
 49
 Appellate judges, from the comparative security of their ivory towers, are not burdened, as was this trial judge (and, indeed, as are all trial judges), with the responsibility of providing for the protection of the jurors, witnesses, and counsel.[7] It can be no answer that no untoward event had occurred up to the opening of the trial. The trial judge had to take such steps as might be necessary in advance to avoid such an event. Cases need not be cited to prove the adage of the futility of locking the barn door after the horse has escaped.
 
 
 50
 Appellants concede that "it is not asserted that the trial court's failure to disclose jurors' exact residence addresses, standing alone, warrants reversal". (J.Br. 12, n.*). They claim, however, that the judge's refusal to inquire into "ethnic" background "in lieu of their identities" deprived them of a fair trial. We disagree.
 
 The Law
 
 51
 Questions as to the trial procedure to be adopted in any particular case must, of necessity, depend upon the issues raised in that specific case. A general principle of law thus has been developed that the trial judge has broad discretion in conducting the Voir dire, e. g., Aldridge v. United States, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); United States v. Taylor, 562 F.2d 1345, 1355 (2d Cir.), Cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083; 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977); United States v. Tramunti, 513 F.2d 1087, 1114 (2d Cir.), Cert. denied, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); United States v. Delay, 500 F.2d 1360, 1366 (8th Cir. 1974), as he does in his conduct of the trial generally.
 
 
 52
 What is required of a trial judge in his conduct of the Voir dire, according to the Supreme Court cases, is that he permit at least some questioning with respect to any material issue that may arise, actually or potentially, in the trial. In Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), the Supreme Court, exercising "supervisory powers" over the conviction of a Negro sentenced to death for killing a white policeman in the District of Columbia, held that it was error to deny Completely all questioning of veniremen directed at eliciting racial prejudice. The standard set by the Court, which remains the standard today,[8] is that the trial court's discretion must be exercised consistent with "the essential demands of fairness", Id. at 310, 51 S.Ct. 470, in the particular case. The Voir dire was held unfair in Aldridge because the trial judge "failed to ask any question which could be deemed to cover the subject", Id. at 311, 51 S.Ct. at 472, in order to uncover a "disqualifying state of mind". Id. at 313, 51 S.Ct. 470.
 
 
 53
 Aldridge rested in part on the fact, brought to the trial court's attention, that counsel had heard that a juror on a previous trial of the case had expressed an attitude about the defendants' race and that of the victim. Id. at 310, 51 S.Ct. 470. The Supreme Court thought that this factor "invite(d) appropriate action by the court", Id. at 311, 51 S.Ct. at 472, so that a fair and impartial verdict would be assured. However, the Court cited an earlier case, Connors v. United States, 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033 (1895), as an example of a case "where the suggestion of bias was held to be too remote" to require a judge to conduct inquiry. 283 U.S. at 314 n. 4, 51 S.Ct. at 473 n. 4. In Connors, a prosecution for interference with elections, the Court rejected the suggestion that the trial judge had abused his discretion in denying all questioning of potential jurors about political beliefs and affiliations because the potential for exposing a juror's bias against the defendant from such line of questioning was simply too remote.
 
 
 54
 Although the Court's decision in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), recognized the importance of the peremptory challenge, and approved questioning of potential jurors to form the basis for such challenges, it did not change the basic rule that a trial judge's discretion will be upheld unless a defendant has been precluded from obtaining an impartial jury. Thus, as noted by the First Circuit in Schlinsky v. United States, 379 F.2d 735, 738 (1st Cir.), Cert. denied, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967):
 
 
 55
 "(I)n our opinion the purpose of the voir dire is to ascertain disqualifications, not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that he believes appropriate for his case."[9]
 
 
 56
 And, as stated in United States v. Robinson, 154 U.S.App.D.C. 265, 269-270, 475 F.2d 376, 380-81 (1973),
 
 
 57
 "The defense must be given a full and fair opportunity to expose bias or prejudice on the part of the veniremen. . . . The possibility of prejudice is real, and there is consequent need for a searching voir dire examination, in situations where, for example, the case carries racial overtones, or involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact. In a case involving such sentiment, the trial court must take it into account and govern the Voir dire accordingly. Still other forms of bias and distorting influence have become evident, through experience with juries, and have come to be recognized as a proper subject for the Voir dire. An example is the problem that jurors tend to attach disproportionate weight to the testimony of police officers. . . .
 
 
 58
 "When the matter sought to be explored on Voir dire does not relate to one of those recognized classes, it is incumbent upon the proponent to lay a foundation for his question by showing that it is reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp. . . . Absent such a showing, (there is) no prejudice to the rights of the accused." (Footnotes and citations omitted).
 
 
 59
 Little purpose would be served by discussing in detail all the many cases in this area. They can be summed up by reference to the discretion standard, and analysis shows that, when questioning can be deemed fair when a jury can be deemed free of bias a trial judge's decision as to the conduct of the Voir dire will be upheld. As long as there is some questioning as to identifiable issues connected in some way with persons, places, or things likely to arise during the trial, an appellate court faced with a cold record should be satisfied that justice has been done.
 
 
 60
 Illustrative of the cases in this area is Yarborough v. United States, 230 F.2d 56, 63 (4th Cir.), Cert. denied, 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487 (1956), in which it was held that there was no error in declining to inquire into jurors' religious backgrounds and affiliations since no matter of religious significance was involved. The court noted that there was nothing to show that defendant belonged to any religious sect or was charged with a crime as to which any sect held particular views. Similarly, in United States v. Daily, 139 F.2d 7 (7th Cir. 1943), a prosecution for avoiding service in the armed services brought against a member of the Jehovah's Witness sect, the trial court had permitted limited inquiry into whether any of the potential jurors entertained a prejudice against members of that minority sect, but refused to ask about their knowledge of matters of the sect's ministry. The Seventh Circuit agreed with the trial court's decision; though religious faith was not directly in issue, still the defendant's religion would be brought to light in the case.
 
 
 61
 There are numerous cases in which a trial court's decision to limit Voir dire has been sustained because the matter sought to be probed by the defendant was too remote from the issues in the case to warrant the intrusion into the potential jurors' private thoughts. See, e. g., United States v. Taylor, 562 F.2d 1345, 1355 (2d Cir.), Cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083; 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977) (no error to deny inquiry into prospective jurors' educational backgrounds and into question whether they had children since questioning was fair to permit intelligent challenges); United States v. Hamling, 481 F.2d 307, 314 (9th Cir. 1973), Aff'd, 418 U.S. 87, 138-40, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (refusal to ask about views toward sex and obscenity was proper in obscenity prosecution); United States v. Workman, 454 F.2d 1124, 1128 (9th Cir.), Cert. denied, 409 U.S. 857, 93 S.Ct. 138, 34 L.Ed.2d 102 (1972) (upholding refusal to ask about attitudes toward drug use, political activists, and antiwar demonstrators in prosecution of antiwar demonstrator for assault on policeman and destruction of government property); Maguire v. United States, 358 F.2d 442, 444-45 (10th Cir.), Cert. dismissed, 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48 Cert. denied, 385 U.S. 870, 87 S.Ct. 138, 17 L.Ed.2d 97 (1966) (upholding refusal to inquire about bias against homosexuals when the defense to charge of auto theft was that car owner had given car to defendants after they had threatened to divulge his homosexuality); Wagner v. United States, 264 F.2d 524, 527 (9th Cir.), Cert. denied, 360 U.S. 936, 79 S.Ct. 1459, 3 L.Ed.2d 1548 (1959) (rejecting argument that specific addresses of jurors were necessary to determine "whether there is any proximity to any possible witnesses or information"; "approximate community" was sufficient). Certainly, in all these cases, the information sought would have been helpful to the defense in the sense that Clarence Darrow envisioned that every bit of information might be helpful. However, because no issue was raised requiring inquiry into the matters as to which requests had been made, the courts made the determinations that inquiry must be reasonably limited. It is not, after all, the prospective jurors who are on trial in the cases that come before the courts. It can be imagined that, as counsel seek more and more information to aid in filling the jury box with persons of a particular type whom they believe to be well disposed toward their clients, prospective jurors will be less than willing to serve if they know that inquiry into their essentially private concerns will be pressed. See Yarborough v. United States, supra, 230 F.2d at 63 (religion is "private matter"; no reason to inquire); Cf. United States v. Arroyo-Angulo, 580 F.2d 1137, 1142 (2d Cir. 1978) (jury provided with special entrance to courtroom "to secure their privacy and protection"). As long as a defendant's substantial rights are protected by a Voir dire designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.
 
 
 62
 Appellants have not advanced any reason that would support the disclosure of the ethnic backgrounds of their trial jurors. There is nothing to indicate that persons of one ethnic type or another are more favorably disposed toward narcotic trafficking or to using firearms. Whatever prejudice may be shared by members of any ethnic group as to black persons would have been uncovered by the questioning about attitudes toward blacks. Thus, it can hardly be said that defendants' right to a fair trial was violated by the limitation on the Voir dire imposed by the trial judge in this case.
 
 
 63
 As to the court's decision to withhold names and addresses of the jurors, appellants take the position that "jurors must publicly disclose their identities and publicly take responsibility for the decisions they are to make . . .." (J.Br. 28). This, however, is not the law and should not be. If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If "the anonymous juror feels less pressure" as the result of anonymity (J.Br. 28), this is as it should be a factor contributing to his impartiality. The court's decision as to anonymity and sequestration comported with its obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality.
 
 
 64
 As noted above, See note 3, Supra, the history of violence in this district is well known. There was much pretrial publicity playing up the alleged acts of violence on the part of the actors in the case. It would be nothing short of irresponsible were a trial judge sitting in New York City to close his eyes to these circumstances.
 
 
 65
 In fact, some fifteen years ago, this court anticipated the problem now before us in another case involving a narcotics conspiracy. In a decision written by Judge Friendly, in which Judge Smith and now-Justice Marshall concurred, the court stated that the events in that case, involving threats to jurors in the form of unsigned letters,
 
 
 66
 "demonstrat(ed) the need for precautions assuring that the addresses, and perhaps even the names, of jurors in cases such as this will be held in confidence; courts must protect the integrity of criminal trials against this kind of disruption, whether it emanated from defendants' enemies, from their friends, or from neither."
 
 
 67
 United States v. Borelli, 336 F.2d 376, 392 (2d Cir. 1964), Cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). It seems that the time has come to approve the precautions suggested in Borelli. It will not do to say that, because there were no actual threats received in the case at bar, Judge Werker's action was inappropriate, for the circumstances were such that the suggestion of disruption was manifest. That is not to say that the courts should sanction the approach taken by this trial judge in every case. However, in a case that generated as much pretrial publicity as this one did and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities.
 
 
 68
 If the giving of names and addresses had been required so that investigation could have been made in the neighborhood or from their families as to their characteristics, any semblance of an impartial jury would have been destroyed. Fear of retaliation against themselves or members of their families would inevitably have been uppermost in their minds during their deliberations. Sequestration would have been no protection in the event of a guilty verdict. And since communication with their families during sequestration would have been permitted, a mere threat to the family of one juror would have permeated the entire jury.
 
 
 69
 As to religion, our jury selections system was not designed to subject prospective jurors to a catechism of their tenets of faith, whether it be Catholic, Jewish, Protestant, or Mohammedan, or to force them to publicly declare themselves to be atheists. Indeed, many a juror might have a real doubt as to the particular religious category into which they could properly place themselves. The same can be said of ethnic background.
 
 
 70
 The courts have recognized the increasing peril in other contexts. For example, in United States ex rel. Lloyd v. Vincent, 520 F.2d 1272 (2d Cir.), Cert. denied, 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269 (1975), a case dealing with the propriety of closing the courtroom to spectators while two undercover narcotics agents testified, Judge Lumbard, concurring, took note of the increasing perils associated with narcotics investigations and prosecutions. He said:
 
 
 71
 "Any judge of a court which is concerned with the prosecution of offenses against the narcotics laws knows all too well the great dangers and difficulties which face law enforcement officers . . . . In no area of law enforcement have murder, mayhem and terror been more frequently used against disclosure and testimony. Against this background of judicial knowledge and notice, the undisputed assertion of the district attorney (relating to the dangers posed to the two agents) was sufficient reason for the county judge's action in closing the court to spectators during their testimony." 520 F.2d at 1275.
 
 
 72
 Unfortunately, the situation which prompted the trial judge's actions in Lloyd, was not uncommon. The courts must recognize the danger, and permit the trial judge appropriate leeway to assure that the trial he is to conduct will be conducted fairly and impartially, with a minimum of intrusion into the lives of the prospective jurors.
 
 
 73
 Appellants' characterization of the procedure followed in this case as a "blind-man's bluff" as constituting a deprivation of their right to meaningfully probe the jurors' potential biases is overstated. A criminal defendant is entitled, under the law, to a fair and impartial jury. To be sure, there must be sufficient information elicited on Voir dire to permit a defendant to intelligently exercise not only his challenges for cause, but also his peremptory challenges, the right to which has been specifically acknowledged by the Supreme Court despite the lack of a constitutional statutory source. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). To say, however, that the limitations imposed in this case constituted a denial of the right to an intelligent exercise of the challenge is to underestimate the ability of counsel to gain the same, or substantially the same, insights into the prospective juror's thoughts by observing his demeanor, generally, and by listening to the answers to questions concerning family, education, and other matters (which were covered rather extensively in this case), as one might gain by being informed of a person's residence address or ethnic background. One's style of clothes, for example, and one's manner of speaking, certainly reveal much about a person's character. Indeed, it is unlikely that the disclosure of any bit of information will contribute to an impression of the person that differs materially from the impression gained by appearances and answers to questions bearing on the case, such as the questions concerning attitudes toward blacks that were asked here.
 
 
 74
 What we are confronted with, then, is a Voir dire procedure under which Both the prosecutor and defense were equally in the dark as to names and addresses of the prospective panelists, and where neither side was told the exact ethnic background or religion of those persons. Both sides, however, had an arsenal of information about each person that was based on his responses to questions concerning his own life, as well as his attitudes about the issues that would arise in the case. This can hardly be deemed "inadequate". The law as to jury selection[10] is not so unbending that it cannot, or should not, be accommodated to the realities of modern day trials in large narcotics cases which have created such problems for the courts in large cities. Clarence Darrow's ideal has already yielded to what has been thought to be the greater necessity, I. e., the need to streamline the Voir dire process by resting the control of it in the district judge, See Fed.R.Crim.P. 24(a), subject to the demand that the essentials of the case should be the subject of inquiry. If that demand is satisfied, then so will have been the rights of the parties.
 
 
 75
 In sum, the trial transcript here reveals that the trial court followed the Voir dire precepts held by the decisions to be essential. The suggestions made by appellants as to fields into which they would roam would, if we were blindly to accept them, lead to Ad absurdum ends. If Darrowesque questioning of prospective jurors were allowed, namely "religion, politics, social standing, family ties, friends, habits of life and thought", any semblance of juror privacy would have to be sacrificed. There is neither statutory nor constitutional law that requires disclosure of information about jurors unrelated to any issue as to which prejudices may prevent an impartial verdict.[11] Nor has any case been brought to our attention that casts any doubt on the procedure followed by the trial judge in this case. Since the court gave counsel full opportunity for an intelligent exercise of challenges by inquiring into the essentials of the case at hand, appellants were not deprived of any trial right which would require a new trial.[12]
 
 II.
 
 76
 Appellants place great stress on an incident which occurred after some six weeks of trial and at the end of a court day. Four defense lawyers were walking along a public sidewalk on a street adjacent to the courthouse when they passed the bus in which the jurors were sitting. Counsel for the defendant Guy Fisher claimed that one of the jurors directing his eyes at him, raised his middle finger in a sign generally recognized to be the antithesis of approval and indicated by an expression on his face "distaste for me (the counsel)". (J.Br. 32). At the time, three other defense lawyers were with Fisher's counsel. The incident was brought to the court's attention that evening. Counsel for Fisher requested that the particular juror be dismissed and that an alternate juror be substituted. The following morning, the court declined to dismiss the juror or to conduct a Voir dire on the subject, which would have involved the juror in question and possibly other panel members. The court felt that a cautionary instruction would be the wisest course to follow, but permitted counsel to put the facts, as he viewed them, on the record. After hearing full argument, the court stated, in substance, that an examination into the subject, namely, a Voir dire, would involve not only all four defense counsel present at the time of the incident, but also possibly the other jurors, and that such an examination "in my (his) opinion would be extremely prejudicial, especially in view of the fact that in all probability the juror is going to say no, I didn't do it, and, as a result of that, there will be resentment which will be engendered throughout the jury against the four of you". (Tr. 5896). The court believed that "no matter what I tell them . . . there is bound to be some passing back and forth of communication". (Tr. 5896-97).
 
 
 77
 Not waiting for the final charge, the court told the jury, without reference to any juror, counsel, or the incident itself, that their personal feelings should not "be reflected for or against any of the defendants or government attorneys". (JA 592).
 
 
 78
 Appellate courts have given, and should give, broad discretion to trial judges to pass upon charges of juror misconduct or disqualifying prejudice made visible in a tangible way. Other cases presented under other circumstances in other courtrooms may provide guidelines, but each case is actually Sui generis. See, e. g., United States v. Bufalino, 576 F.2d 446, 451-52 (2d Cir. 1978), Cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978); United States v. Hockridge, 573 F.2d 752, 756 (2d Cir. 1978), Cert. denied sub nom. Easton v. United States, 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978); United States v. Panebianco, 543 F.2d 447, 457 (2d Cir. 1976), Cert. denied, 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977).
 
 
 79
 In Panebianco, for example, defense counsel complained that, during cross-examination of a Government witness, one juror had commented "Why doesn't he stop wasting my time with these questions?" and "Well, he's already answered that question"; a second juror had purportedly said "He's got some nerve asking these questions". 543 F.2d at 457. Although the attorneys had asked the trial judge to question the two jurors to ascertain bias, this court upheld the trial court's decision to simply reiterate an instruction not to discuss the case or to form any opinion. Writing for this court, Judge Lumbard stated that "the jurors were only exhibiting impatience . . . . That jurors react naturally does not mean they are biased. By reiterating his cautionary instruction to the jury, (the trial judge) did all that was necessary. Under the circumstances this was probably a wiser course than a voir dire and was clearly not an abuse of discretion". Id.
 
 
 80
 Even in the cases where other procedures have been taken by a trial judge faced with allegations of juror bias during the trial and approved by this court, the approval has been based on the reality that the trial judge observing the jury on a day to day basis (and in the case before us, on a week to week basis), is in the best position to sense the atmosphere of the courtroom as no appellate court can on a printed record. Any incident, such as the one that allegedly occurred in this case, puts court and counsel on the alert to observe the jurors even more intently during the remaining time, which, in this case, was another four weeks. In those four weeks, no other incident was noted or reported.
 
 
 81
 Fortunately, appellate courts are shielded from knowledge of the deliberations in the jury room. We are not so unworldly, however, as not to know that there are skilled counsel who profess to be able to foretell a juror's reactions. We, in turn, can only look at the facts objectively. We know that there was no verdict of guilty against Guy Fisher, whose counsel was allegedly the target of the juror's distasteful gesture, but rather a "hung jury" as to that defendant. We cannot, therefore, verify the prophecy of Fisher's counsel that "This man (the juror in question) is certainly not going to vote not guilty in this case". (Tr. 5892). There is thus no basis for any conclusion that the juror was faithless to his jury commitment. We do know, also, that two defendants were acquitted, that Barnes himself was acquitted on the FOURTH, FIFTH and ELEVENTH Counts, and that McCoy was acquitted on two firearms counts (NINTH and TENTH). Any fear that the allegedly prejudiced juror could have led the jury to a verdict of guilty is belied by the result.
 
 
 82
 Under the circumstances, the court exercised its discretion wisely. A Voir dire might well have brought forth appeals on the ground that such an occurrence as happened here was prejudicial to all defendants. The trial judge's conduct of the matter was entirely appropriate.
 
 III.
 
 83
 On the trial, the Government introduced into evidence the income tax returns obtained from the Internal Revenue Service (IRS) of defendants Barnes, Hayden, Guy Fisher, Hines, and Wayne Sasso. All appellants now attack the refusal of the trial court to hold a hearing so that they might inquire as to the papers on which, and the manner by which, the Government obtained these returns. As to the returns themselves, appellants assert that their prejudicial effect outweighed their relevance to the issues and also violated appellants' privilege against self-incrimination.
 
 Obtaining the Returns
 
 84
 Appellants argue that they were entitled to have the information upon which the court issued its order and to a hearing on their motion to obtain it. 26 U.S.C. § 6103(i)(1),[13] a part of the Tax Reform Act of 1976, provides for disclosure of tax returns and return information to federal officers for non-tax-related criminal investigation purposes, upon an Ex parte order by a federal district court judge, when authorized by the Attorney General, the Deputy, or an Assistant. The judge determines "on the basis of the facts submitted by the applicant" whether (1) a specific criminal act has been committed; (2) the return (or return information) is probative; and (3) the return is the most probative evidence of the alleged criminal act. If these questions are answered in the affirmative, the tax information may be entered into evidence in a criminal proceeding under 26 U.S.C. § 6103(i)(4).
 
 
 85
 There is nothing in the statute providing for notice to the taxpayer, a hearing on the application, or disclosure of the information on which the judge acted. In short, the procedure specified is Ex parte.
 
 
 86
 Appellants, relying on United States v. Mangan, 575 F.2d 32 (2d Cir. 1978), would have the statute construed otherwise, and would analogize the disclosure order to search warrants and wire-tap orders. In Mangan, Judge Friendly, discussing the statute in a different context, did refer to the procedure for obtaining returns as a "type of search warrant procedure". Id. at 38. However, Congress, in broadening the taxpayers' protections by enacting the Tax Reform Act of 1976, of which 26 U.S.C. § 6103(i) is a small part, had before it the search warrant and wire-tap procedures, which differ from the procedure specified in the new statute. The legislators were apparently content to rely on a judge's competence to pass upon the facts submitted and the need for disclosure in a given case. Although the Mangan case refers to a "suppression motion" in connection with the use of tax returns, such a reference to an issue that was not specifically before that panel (I. e., whether a defendant may test the use of tax returns by means of a motion to suppress) is not determinative. Nor is it determinative that in Mangan, Judge Friendly cited a wire-tap case, United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), to support a conclusion that an application for disclosure of tax returns Must be authorized by one of the officials named in the statute, for although it is true that there is some degree of similarity between the procedures involved in obtaining disclosure of tax returns and wire-tap orders of search warrants, the procedures are governed by different statutes. Unlike the wire-tap and search warrant provisions, See18 U.S.C. §§ 2518(9), (10) (wire-tap) and Fed.R.Crim.P. 41(f) (search warrant), there is nothing in the Tax Reform Act indicative of congressional intent to subject a judge to examination by defense counsel as to the facts on which he based an order to disclose tax returns, or his rationale therefor. The courts should be loath to imply an exclusionary sanction in this context, especially since none appears in the Tax Reform Act itself and since civil and criminal penalties have been expressly provided. 26 U.S.C. §§ 7213(a) (criminal penalties), 7217 (civil remedies in favor of taxpayer).
 
 Relevance of the Returns
 
 87
 Evidence of the possession and receipt of huge amounts of money is highly relevant in an operation in which the costs of the commodity and the profits therefrom are astronomical. According to the evidence at trial, the various defendants in the conspiracy, during the period thereof, owned and/or operated (through "leasing" companies, on one of which operated out of the Harlem River Motors Garage, one of the focal points of the conspirators' activities) a variety of cars, including Mercedes Benz, Cadillacs, Corvettes, a Citroen Maserati (Barnes), a Jaguar (Baker), and a host of other cars. As part of its proof, the Government introduced the tax returns of defendants Barnes, Hayden, Guy Fisher, Hines, and Wayne Sasso (Sasso was acquitted), which showed reported "miscellaneous" income totalling collectively over $1,380,000 for the years 1974-76. Barnes and the other four all used the same tax attorneys' firm in Detroit, Michigan, a city quite distant from the alleged sites of the defendants' operations. The Government also showed that defendant Monsanto filed no federal tax returns during the alleged conspiracy, and that Hatcher reported only moderate amounts of income, despite the fact that Monsanto was the driver of at least 17 leased cars during the period, and Hatcher was the driver of 13, including a Mercedes Benz. (Hatcher was also shown to have purchased a Mercedes from a New Jersey doctor in 1976, for the sum of $16,500, paid in ten- and twenty-dollar bills.)
 
 
 88
 The mere fact that the defendants listed large amounts under the headings of "miscellaneous" and "other" income was, in and of itself, a warning signal that the money came from a source which the recipient preferred not to disclose. A legitimate source, as the Government argues, could easily have been identified and stated.
 
 It has long been the rule that
 
 89
 "where a defendant is on trial for a crime in which pecuniary gain is the usual motive, evidence of the sudden acquisition of money by the defendant is admissible, even though the source of the money is not traced". United States v. Jackskion, 102 F.2d 683, 684 (2d Cir.), Cert. denied, 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939).
 
 
 90
 See also United States v. Hinton, 543 F.2d 1002, 1012-13 (2d Cir.), Cert. denied sub nom. Carter v. United States, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976) (in narcotics prosecution, proper to introduce evidence of large expenditures of cash, as well as evidence of failure to file returns); United States v. Magnano, 543 F.2d 431, 437 (2d Cir. 1976), Cert. denied, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977) (evidence of defendant's possession of huge sums of cash admissible to show, Inter alia, "means" for narcotics trafficking); United States v. Tramunti, 513 F.2d 1087, 1105 (2d Cir.), Cert. denied, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975) (same); United States v. Falley, 489 F.2d 33, 38-40 (2d Cir. 1973) (proper to show defendants' substantial expenditures for travel costs and tax returns suggesting no legitimate source). The rule is no less applicable in this case; that the Government showed receipt of large amounts of money by the defendants' own declarations that they had received it as income makes the evidence no less relevant. Not only was it probative of the conspiracy and substantive counts, but, as to Barnes, it was offered to show an element of the offense of conducting a "continuing criminal enterprise", 21 U.S.C. § 848, I. e., that the defendant obtained "substantial income or resources" from the enterprise. 21 U.S.C. § 848(b)(2)(B).
 
 
 91
 As the Government argues, the returns were also relevant in this case to establish the existence of the conspiracy and its membership. The defendants' returns were all prepared by one law firm in Detroit, Michigan. Hayden's return for 1976 showed a marked increase in miscellaneous income over his 1975 income, which corresponded with the Government's theory that Hayden was "promoted" to the Number 2 spot in the "Barnes conspiracy" in 1976 after Guy Fisher, the previous Number 2 man, was jailed. Indeed, Guy Fisher's return for 1976 shows a marked decrease over that same period.
 
 
 92
 If there was any prejudice stemming from the Government's use of the tax returns, it was of defendants' own making.
 
 Self Incrimination
 
 93
 Defendants argue that, though they did not assert their Fifth Amendment privilege on the returns themselves, they should have been permitted to assert it when the Government sought to use the returns at trial. The short answer to this contention is Garner v. United States, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976), in which the Court held that disclosures made on tax returns were not "compelled incriminations". Had defendants wished to claim the privilege, they should have done so on the return itself.
 
 
 94
 It will not do to argue that, since a refusal to disclose income has been held to render a return "no return at all", United States v. Jordan,508 F.2d 750 (7th Cir.), Cert. denied, 423 U.S. 842, 96 S.Ct. 76, 46 L.Ed.2d 62 (1975), appellants could have been prosecuted under 26 U.S.C. § 7203 for filing "no return" had they invoked their privilege instead of making their disclosure. The prosecution in Jordan was undertaken against a taxpayer whose attempted assertion of the privilege was deemed invalid insofar as the defendant gave No information other than his name, address, and social security number, purporting to make a "blanket fifth amendment declaration" as to the remaining questions, even the innocuous ones. However, as is made clear in United States v. Sullivan, 274 U.S. 259, 263-64, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), the right to make a Valid claim of privilege is available even as to amount of a taxpayer's income, as well as any other item on the return which could legitimately cause self-incrimination. If, as appellants argue, cases "such as Jordan " are undercutting the Sullivan Court's guarantees against convictions for willful failure to file a tax return, 26 U.S.C. § 7203, in cases where a Valid claim of privilege has been asserted, then the proper remedy is to appeal from those convictions pursuant to Sullivan, not to change the rule enunciated in Garner. Since appellants did not claim the privilege on their returns, their Fifth Amendment rights were not violated at trial.
 
 
 95
 Appellants also claim error with respect to a portion of the prosecutor's summation, in which he discussed the large sums of cash taken from various defendants and reported on the tax returns. They argue that the prosecutor's challenges to the defense attorneys to explain the sources of the income constituted impermissible comment on defendants' failure to testify, in violation of their privilege to refrain from so testifying.
 
 
 96
 In United States v. Bubar, 567 F.2d 192, 199 (2d Cir.), Cert. denied, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977), a case in which the prosecutor commented upon the defendants' failure to explain Government evidence, the court held that
 
 
 97
 "the substance of the prosecutor's comments (did not) violate appellant's constitutional rights. The prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case, United States v. Dioguardi, 492 F.2d 70, 81-82 (2 Cir.), Cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), as well as his failure to support his own factual theories with witnesses. United States v. Rodriguez, 556 F.2d 638, 641 (2 Cir. 1977); United States v. Lipton, 467 F.2d 1161, 1168 (2 Cir. 1972), Cert. denied, 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973). A constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the jury 'naturally and necessarily' would interpret the summation as a comment on the failure of the accused to testify. United States ex rel. Leak v. Follette, 418 F.2d 1266 (2 Cir. 1969), Cert. denied, 397 U.S. 1050, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1970)."
 
 
 98
 As in Bubar, so in Barnes, the prosecutor was not suggesting the absence of contradicting evidence that only the defendants could supply. Certainly, there were witnesses other than defendants who could have testified about nonnarcotics-related sources of cash and "miscellaneous" income. Appellants' assumption that they were the only persons who could explain the source is contrary to a realistic view of the situation. No jury could possibly think that no independent witnesses to the receipt of income existed.
 
 
 99
 We therefore conclude that the returns were properly obtained and received into evidence, that appellants were not deprived of their rights against self-incrimination, and that the prosecutor's summation was within the bounds of propriety.
 
 IV.
 
 100
 Appellants argue reversible error in the trial court's refusal to accept proof which they claim would have established multiple conspiracies operating out of the Harlem River Motors Garage, namely a conspiracy, separate from the Barnes conspiracy, operated by one Robert Stepeney, not a defendant. By an offer of proof "they wished to prove: that there was an alternative source of drugs at the garage and therefore a separate and distinct conspiracy from the one charged in the indictment". (McCoy Br. 19). In other words "if they were members of any conspiracy at all, it was not one involving Nicky Barnes, but, rather, one headed by Robert Stepeney and possibly involving Shepard Franklin". (Joint Reply Br. 39).
 
 
 101
 The proffered proof would have consisted of calling Sam Bellovin, an accountant for Harlem River Motors Garage, who would have testified that he had delivered to IRS agent Kukis certain "Stepeney papers" which had come from a Harlem River Motors Garage safe; Kukis, in turn, would have testified that he had discovered among Stepeney's papers a quantity of heroin; and Martorell, a chemist, that the heroin was 23 percent pure an unusually high percentage.[14] Appellants claim that Stepeney himself had been observed at the Harlem River Motors Garage at least five times on the night of February 25, 1977, the date on which an alleged "transaction" took place.
 
 
 102
 Appellants also argue that the proffered proof would have affected the credibility of Wallace Fisher who had told Geronimo that Barnes oversaw all transactions at the Harlem River Motors Garage, presumably on the theory that Stepeney, too, played a similar role.
 
 
 103
 If the proffered evidence is viewed in the light most favorable to the defendants, the most that could have been proved was that Stepeney was a heroin dealer who worked out of the Harlem River Motors Garage. The defense did not offer any proof that Stepeney was the manager of an organization or was Barnes' partner, boss, or anything else. The Stepeney-Franklin operation was irrelevant to the existence of a Barnes conspiracy because it would merely have shown the existence of another division of the Barnes conspiracy, or at most, a parallel conspiracy which operated out of the Harlem River Motors Garage. Since there was sufficient evidence connecting all the defendants to the Barnes conspiracy, the trial court, which had the benefit of approximately six weeks of trial, was justified in excluding the irrelevant evidence of Stepeney's possible heroin activities.
 
 V.
 
 104
 All defendants place great emphasis on a claim that the Government failed to disclose material in its possession as required by the principles enunciated in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and under 18 U.S.C. § 3500. The issue involved a difference in the testimony of Geronimo and DEA Agents as to the activities of Geronimo and Fisher on the evening of November 29, 1976, between the hours of approximately 5:00 P.M. and 9:00 P.M. Geronimo had testified to an extensive trip with Fisher in Fisher's car to various bars and a poolroom in upper Manhattan. Upon their return to Fisher's garage, Geronimo is purported to have told Agent Diaz that they had discovered the source of the narcotics about to be sold that evening by Rollock to Diaz, namely, it was coming from "Jazz" a nickname for Hayden, who in turn worked for Barnes and was "blessed" by "Nicky". (Tr. 2054-55, 4243).
 
 
 105
 This account, defendants contend, was completely false as shown by a surveillance report of Agent Shea (GX. 3511B for identification) used by Agent Lawler to refresh his recollection as to the events of November 29th. Out of the wide discrepancies[15] defendants make two contentions: (1) the Government should have advised them of the existence of Exh. 3511B in advance of the Geronimo testimony so that it might have been used on cross-examination, and (2) that the Government knew or should have known that Geronimo's testimony was perjured. From this situation defendants drew the conclusion that it "was a deliberate eliciting of false testimony from a key witness concerning a material issue at trial". (McCoy Br. 42). It should be noted that Lawler and Special Agent Thomas Rooney conducted the surveillance of Geronimo. Their observations were consolidated in a report by Agent Shea. Lawler was called to testify by defendant Barnes.
 
 
 106
 Every inconsistency in witnesses' testimony does not mean that one witness is guilty of perjury the other not. These are questions for jury resolution. The important appellate question is: was material which might have affected the jury's verdict improperly withheld from the defendant? In this case, we think not.
 
 
 107
 First, we agree with the Government that the "inconsistencies" between Geronimo's testimony and the report were not so great as to be completely contradictory. Lawler's and Rooney's surveillance covered only one of the three hours during which Fisher and Geronimo had been together.
 
 
 108
 Second, even if inconsistent, at the end of the day on which Geronimo completed his testimony, the exhibit in question (Exh. 3511B Id.), together along with other § 3500 material was given to defendants. At this point they had two choices, either to recall Geronimo for further cross-examination or to call the Agents who had conducted the surveillance or both. They chose to call agent Lawler, whose testimony contradicted that of Geronimo, and was consistent with his earlier surveillance report. The fact that defendants' counsel now think that they could have made better use of the material on Geronimo's cross-examination cannot justifiably impute to the prosecution the elicitation of perjured testimony from Geronimo or the willful suppression of § 3500 material. Furthermore defense counsel took full advantage of the difference in the testimony in their attacks on Geronimo's credibility in their summations. We thus find that appellants were not deprived of Brady material.
 
 VI.
 
 109
 Appellants argue that it was error to receive in evidence on the Government's direct examination, written agreements between the Government and certain witnesses stating the understandings between the parties as to benefits to be bestowed by the Government on the witnesses in return for their truthful cooperation. Appellants' claim is that such agreements are tantamount to improper vouching by the Government for the credibility of the witnesses.
 
 
 110
 The practice of reducing such agreements to writing has grown out of situations which have frequently arisen in which there have been disputes as to the terms of oral understandings on the subject. The writing presents the opportunity for both parties to know the exact nature of their commitments.
 
 
 111
 While this court has repeatedly upheld the use of cooperation agreements in the face of claims of "improper vouching" by the Government for its witnesses, United States v. Ricco, 549 F.2d 264, 274 (2d Cir.), Cert. denied, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); United States v. Araujo, 539 F.2d 287, 290 (2d Cir.), Cert. denied, 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976); United States v. Aloi, 511 F.2d 585, 597-98 (2d Cir.), Cert. denied, 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); United States v. Koss, 506 F.2d 1103, 1112-13 (2d Cir. 1974), Cert. denied, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975), the decisions in these cases were made with respect to cooperation agreements introduced by the Government on redirect examination of witnesses whose credibility had been attacked on cross-examination. In the case at bar, appellants made timely objections to the use of agreements made by the two main prosecution witnesses, informers Robert Geronimo and Promise Bruce, when they were offered during the direct testimony of these two witnesses.
 
 
 112
 After the time of the trial in this case, the court decided United States v. Arroyo-Angulo, 580 F.2d 1137 (2d Cir. 1978), which involved the same point appellants raise here. In Arroyo-Angulo, this court recognized that, although the use of a cooperation agreement cuts both ways insofar as it suggests not only a promise to testify truthfully, but also a motive to testify as the Government wished (regardless of where the truth may lie), the agreement, when introduced by the Government, is used primarily to bolster the credibility of a witness.
 
 
 113
 Thus, the Arroyo-Angulo court decided that, under established rules of evidence, the Government should not be permitted to introduce an agreement into evidence on direct examination. In Arroyo-Angulo, however, the error in admitting the agreement on direct examination was found not to be reversible since the objection to its use had not specifically concerned itself with the timing of its admission, and since cross-examination had been vigorous and thorough. The agreement would thus have been admissible at a later stage since "the cooperation agreement was a matter which the jury could properly consider in relation to the witness' credibility". 580 F.2d at 1147.
 
 
 114
 In view of the fact that Arroyo-Angulo was decided after the trial in this case, and considering the "inevitability of defense counsels' attack on (Geronimo's and Bruce's) credibility", Arroyo-Angulo, Supra, 580 F.2d at 1147, the error in admitting the agreements on the Government's direct examination cannot be deemed sufficiently prejudicial to warrant reversal. The agreements were used by the prosecution here only to show the express terms of the understanding between the witnesses and the Government, and there was no improper argument on the part of the prosecutor, either during examination of the witnesses, or during openings or summation, which would constitute improper vouching. The jury was repeatedly told that they, and they alone, had the duty of considering the witnesses' testimony and of giving it the weight they thought due to it. Appellants were thus not prejudiced by the improper timing of the introduction of the agreements.
 
 VII.
 
 115
 Error is also asserted in the refusal of the trial court to suppress evidence derived from an electronic surveillance device (referred to as a " bug") which had been installed at the Harlem River Motors Garage, the locale of much of the narcotics traffic. The court order for the installation of the bug was obtained on February 9, 1977, upon the affidavits of DEA Special Agent Pavlick (the Agent) and an Assistant United States Attorney. The period of interception was from February 18, 1977 to March 10, 1977. Five tapes which resulted from this interception were received in evidence. Defendant Hatcher had made a motion, orally denied, to suppress the tapes on the ground that the Agent's affidavit contained "false and/or perjurious allegations". The motion was subsequently renewed after the Government had disclosed to the court and to defendants that an informant, Promise Bruce, had recanted certain information which he had given to the Agent and which the Agent, in turn, had included in his affidavit. The court below ruled that no facts had been advanced which suggested that Pavlick had known when he submitted his affidavit that any information was false, and further held that, even omitting Bruce's information, the application still set forth facts constituting probable cause.[16]
 
 
 116
 The primary issue on this subject is whether the Agent knew that his statements were "false and/or perjurious" or were "deliberately misleading" misstatements of fact as otherwise known to him, for, unless the Affiant committed a knowing falsehood or "other imposition" on a judicial officer, United States v. Dunnings, 425 F.2d 836, 840 (2d Cir. 1969), Cert. denied, 397 U.S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412 (1970), suppression is not required. In United States v. Merchant Diamond Group, Inc., 565 F.2d 252 (2d Cir. 1977) (per curiam), this court repeated the established rule that " '(p)robable cause is not defeated because an informant may have erred or lied, "as long as the affiant accurately represented what was told him" '." Id. at 253, Quoting Mapp v. Warden, 531 F.2d 1167, 1172-73 (2d Cir.), Cert. denied, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976), Quoting in turn United States v. Sultan, 463 F.2d 1066, 1070 (2d Cir. 1972). Indeed, since the date of oral argument in this case, the Supreme Court has itself dealt with the issue of the necessity for a hearing in the face of allegations of false statements in affidavits supporting search warrants. In Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Court held that, as a matter of Fourth Amendment law, a hearing was to be afforded to a defendant who made "a substantial preliminary showing" that an affiant had knowingly and intentionally made a false statement in an affidavit, or had included such a statement with reckless disregard for the truth, but only "if the allegedly false statement is necessary to the finding of probable cause". Id. at 156, 98 S.Ct. at 2677. The Court expressly limited its holding, stating that "(t) he deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant". Id. at 171, 98 S.Ct. at 2685. Thus, the rule is clear that, absent a showing that Pavlick himself had knowingly included false statements in his affidavit, there is a basis neither for a hearing, nor for suppression itself. Furthermore, as held by the court below, even if false statements had been included, since probable cause remained even in the absence of the allegedly falsely stated facts, no relief was necessary.
 
 
 117
 There is nothing in the record to indicate that Pavlick had been aware, prior to submitting his affidavit, that the information provided by Geronimo and Bruce had been false. As the Government argues, there was no showing that Pavlick, at the time of the affidavit, knew of Lawler's surveillance on November 29, even assuming that such knowledge should have been included if known. Even if Pavlick had been made aware of Lawler's surveillance efforts on November 29 at the time he (Pavlick) applied for the " bugging" authority, there is nothing which would have alerted him to any inconsistency, for the informant's statement did not detail the activities of Geronimo and Fisher during the three-hour period in dispute, See note 16 Supra, which was the period of Lawler's surveillance.
 
 
 118
 Furthermore, as the district court suggested, there was sufficient information upon which to find probable cause for the issuance of the surveillance order even without the allegedly false information: whether Geronimo and Fisher had driven around in a car for some three hours, or whether the car had been garaged for over an hour, might well be immaterial to the question whether electronic surveillance was necessary. Furthermore, whether Fisher had stated on November 24th that the heroin was to be coming from Barnes or was from "Barnes' people", as the tape of Fisher's conversations proved to be the case, would not be determinative of the need for installation of the bug at the Harlem River Motors Garage. The suppression motions were thus properly denied.[17]
 
 VIII.
 
 119
 Appellants urge that all sentences must be vacated because of the trial court's improper consideration in imposing sentence of their failure to cooperate. The subject of sentencing and the formulation of standards therefor, if such be possible, has recently received increasing attention from courts, bar associations, the bar and from the writers of various legal treatises. However desirable some standards may be to avoid present, frequently gross, disparities in sentencing, the fact will always remain, because of the many variables attached to each case, that each situation requires its own special treatment. Would that a simple algebraic formula consisting of the crime, times the defendant's history, times extenuating circumstances, which would equal the proper sentence, be productive of universally fair sentences; were this the case, the courts should be the first to welcome its adoption. In actual practice the rationale of sentencing is not that simple nor should it be.
 
 
 120
 Although appellants would overly stress "failure to cooperate" as a motivating factor in the imposition of the sentences by the trial court, a review of the sentencing minutes shows it only to have been one factor which the court took into consideration. Each defendant's case and the degree of criminality was weighed and evaluated. The court followed the admonition: "Let the Punishment Fit the Crime".[18]
 
 
 121
 The cases cited by appellants are illustrative of the principle that each sentence should be imposed only after a consideration of the particular situation presented. United States v. Ramos, 572 F.2d 360 (2d Cir. 1978), on which appellants rely, involved a young man with no prior record of narcotics violations either as a distributor or a user, but who, for much needed money, had acted as a transporter (sometimes referred to as a " mule") of drugs (a first offense). He had cooperated to the extent of furnishing the name of the person for whom he had been acting but had ceased his cooperation because he "feared the consequences to his family". Id. at 361. It was quite obvious that this unusually harsh sentence (10 years' imprisonment plus 10 years' probation) was prompted by Ramos' refusal to continue his cooperation. In imposing sentence the court may consider a defendant's cooperation or lack thereof as long as All factors are considered. United States v. Vermeulen, 436 F.2d 72 (2d Cir. 1970). Thus, reference to a lack of cooperation as a factor does not render a sentence subject to resentencing because of any infirmity therein. The wide range of sentences imposed on the eleven defendants is convincing proof in itself that the court considered many factors in addition to non-cooperation in arriving at these diverse results. We find nothing in the record to require resentencing under Ramos.
 
 IX.
 
 122
 Many of the appellants raise issues relating to the scope of the conspiracy or the sufficiency of the proof of their participation. The admissibility of alleged co-conspirators' statements is also challenged. A very brief summary of the principles governing conspiracy cases will, therefore, be useful. Specific facts concerning each appellant's connection to the Barnes conspiracy will be presented when each appellant's claims are discussed. Some of the facts which demonstrate how all the defendants are interconnected will be collected here along with the summary of the legal principles.
 
 
 123
 The gist of the offense of conspiracy is agreement. In determining what kind of agreement or understanding existed as to each defendant,
 
 
 124
 "(C)ourts often look to such factors as knowledge and dependency as evidence of an agreement. These factors, in turn, may be inferred from an assessment of the nature of the criminal enterprise and the defendant's role in it . . . ." United States v. Taylor, 562 F.2d 1345, 1352 (2d Cir.), Cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083; 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977).[19]
 
 
 125
 Therefore, if the Government can prove that a defendant was purchasing heroin from a middleman whom he knew was participating in a large organization which parcels out various tasks among its members, the jury may conclude that he agreed with those members even if he did not know their identities or locations. Importers, wholesalers, purchasers of cutting materials, and persons who "wash" money are all as necessary to the success of the venture as is the retailer. They can all be held to have agreed with one another in what has been called a "chain" conspiracy. United States v. Agueci, 310 F.2d 817 (2d Cir. 1962); United States v. Bruno, 105 F.2d 921 (2d Cir.), Rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939). Knowledge of the organization's nature and the interdependence of the members justifies the inference of agreement.
 
 
 126
 Similarly, retailers whose existence is actually unknown to each other can be held to have agreed in a single conspiracy if each knew or Had reason to know that other retailers were involved in a broad project for the importation, distribution, and retail sale of narcotics and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture. United States v. Baxter,492 F.2d 150, 158 (9th Cir. 1973), Cert. denied, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). The intermediate inference of knowledge is permissible if each retailer knows that the wholesaler or middleman handles a larger quantity of narcotics than one retailer can sell. Cf. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947).
 
 
 127
 Although the Barnes organization was loosely knit, several aspects of its operations serve to define a core group of wholesalers and retailers. The Government proved that many of the activities of the Barnes organization were geographically centered in two garages, Harlem River Motors Garage (owned or managed by Hatcher) and Kingdom Garage (managed by Fisher). The close proximity of the defendants' activities is one factor to be considered in finding that one conspiracy existed. See Berenbeim v. United States, 164 F.2d 679 (10th Cir. 1947), Cert. denied, 333 U.S. 827, 68 S.Ct. 454, 92 L.Ed. 1113 (1948). Besides serving as a focal point for narcotics transactions, the garages served to store the conspiracy's automobiles. Barnes, Baker, Monsanto, Hatcher, Hayden, and Hines drove cars which were registered to Hoby Darling Leasing Corporation; some of these defendants also operated cars registered to Kingdom Auto Leasing Corporation or Harlem River Motors.[20] (This group exhibited an almost unanimous appreciation of Mercedes Benzes; Hatcher operated ten different Mercedes Benz automobiles at different times during the investigation.) This court has found that the common use of automobiles and the "mingling" of the vehicles at the same garage and other gathering places can betoken the interlocking interests of the alleged co-conspirators, supporting the inferences of knowledge and dependency. United States v. Valenti, 134 F.2d 362 (2d Cir.), Cert. denied, 319 U.S. 761, 63 S.Ct. 1317, 87 L.Ed. 1712 (1943) (conspiracy to manufacture and distribute illicit alcohol). Some members of the conspiracy even used the same Detroit tax attorneys (see discussion at p. 147, Supra ). Finally, the conspirators frequented the same social clubs, where narcotics-related transactions occurred or were arranged.
 
 
 128
 In conjunction with the above facts, testimony of Geronimo, Bruce, and DEA agents with respect to their observations of the participants' activities serves to define the scope of the conspiracy. With all these facts before it, the jury was justified in concluding that there was one conspiracy (which we will call the Barnes conspiracy).
 
 INDIVIDUAL CLAIMS OF APPELLANTS
 
 129
 It now becomes necessary to consider the arguments advanced by each appellant on issues primarily affecting him. If an appellant has attacked his conviction for conspiracy, additional facts showing his particular connection to the conspiracy will be presented.
 
 X.
 LEROY "NICKY" BARNES
 
 130
 Barnes was convicted of Count 1 (conspiracy), Count 2 (continuing criminal enterprise), and Count 3 (possession and distribution). On Count 1 no sentence was imposed in view of the imposition of a life sentence (and a $100,000 fine) on Count 2. See Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). On Count 3, Barnes was sentenced to 15 years' imprisonment, a special life parole term, and a $25,000 fine. Barnes' principal point, other than error claimed with respect to the denial of his motions to suppress evidence (which we find without merit),[21] is that there was insufficient evidence to sustain his conviction under Count 2.
 
 
 131
 There can be little doubt that the proof presented at trial was adequate to place Barnes within the ambit of a conspiracy. One does not use $150,000 worth of quinine a month for the altruistic purpose of curing the population of New York of malaria, or use mannite as a dusting powder. It was no coincidence (at least a jury could so find) that many defendants, including Barnes, chose the same Detroit tax firm to prepare their income tax returns or that the term "miscellaneous" was used to describe income running collectively to over a million dollars. The jurors were entitled to draw their own inferences from evidence of the galaxy of high-price automobiles, corporate-owned to shield them from forfeiture, used and/or leased by the defendants. The many money "washes" could easily be interpreted as an essential part of any narcotics distribution organization. The conspiracy count was thus properly supported, as was Barnes' conviction under substantive Count 3.
 
 
 132
 We are satisfied, moreover, that the evidence was sufficient to sustain Barnes' conviction on Count 2. The "Continuing criminal enterprise" statute, 21 U.S.C. § 848, was aimed at the organizers of criminal conspiracies having five or more members. United States v. Crisp, 563 F.2d 1242, 1244 (5th Cir. 1977). Because conspiracy to distribute is a lesser included offense, Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), evidence admissible on one count will generally be admissible on the other. United States v. Crisp, supra, 563 F.2d at 1244-45. It is well established that the out-of-court declarations of co-conspirators made in the course of and in furtherance of the conspiracy are admissible against all those involved in the conspiracy. Federal Rule of Evidence 801(d)(2)(E); United States v. Manarite, 448 F.2d 583, 590 (2d Cir.), Cert. denied, 404 U.S. 947, 92 S.Ct. 298, 30 L.Ed.2d 264 (1971). Indeed, where the parties are engaged in a "concert of action" or " joint venture" involving criminal conduct, out-of-court declarations are admissible even though the indictment does not charge conspiracy. United States v. Alsondo, 486 F.2d 1339, 1346-47 (2d Cir. 1973), Rev'd on other grounds sub nom. United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); United States v. Ushakow, 474 F.2d 1244, 1245 (9th Cir. 1973); United States v. Adams, 446 F.2d 681, 683 (9th Cir.), Cert. denied,404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971).
 
 
 133
 It is equally well established that the commission of a crime may be proven by circumstantial evidence. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Glasser, 443 F.2d 994, 1006-7 (2d Cir.), Cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971); United States v. Bowles, 428 F.2d 592, 597 (2d Cir.), Cert. denied, 400 U.S. 928, 91 S.Ct. 193, 27 L.Ed.2d 188 (1970). Moreover, to establish a defendant's guilt, the evidence need not be of such a nature as to exclude every reasonable hypothesis of innocence. United States v. Aadal,368 F.2d 962, 964 (2d Cir. 1966), Cert. denied, 386 U.S. 970, 87 S.Ct. 1161, 18 L.Ed.2d 130 (1967). It must be examined in its totality, not by microscopic dissection of bits and pieces. United States v. Taylor, 464 F.2d 240, 244 (2d Cir. 1972); United States v. Dardi, 330 F.2d 316, 335 (2d Cir.), Cert. denied, 379 U.S. 845, 869, 85 S.Ct. 50, 117, 13 L.Ed.2d 50, 73 (1964); United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961), Cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962). Finally, the evidence on the whole must be viewed in the light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). If the proof, so viewed, is such that a jury, drawing reasonable inferences therefrom, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt, it is sufficient. United States v. Taylor, supra, 464 F.2d at 244-45; United States v. Glasser, supra, 443 F.2d at 1007. The Government's evidence against Barnes, when examined in accordance with the above precepts, was sufficient to sustain his conviction under Count 2.
 
 
 134
 Section 848 requires that the defendant's narcotics violation must be part of a continuing series of violations which are undertaken in concert with five or more persons with respect to whom the defendant occupies a position of organizer, a supervisory position, or any other position of management and from which the defendant obtains substantial income or resources. The statute does not require that the five subordinates must act in concert at the same time. United States v. Bolts, 558 F.2d 316, 320-21 (5th Cir.), Cert. denied sub nom. Hicks v. United States, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). As already discussed, Barnes' financially rewarding participation in a continuing criminal enterprise with five others was clearly established.
 
 
 135
 In determining whether Barnes played a supervisory role in this continuing enterprise, the jury could have considered the evidence concerning his negotiations for the purchase of large quantities of quinine and mannite and could have concluded that purchases such as these would not be made by an underling in the organization. The jury could also have weighed the evidence concerning Barnes' arrangements for "money-washing" and reached the same conclusion. Proof that Barnes rented two expensive apartments in New Jersey, masquerading in one as Hoby Darling and in the other as Wallace Rice, gave rise to a reasonable inference that he was entitled to exercise certain prerogatives of authority. Evidence that he was attended by bodyguards was likewise illuminating; ordinary narcotic dealers are not so carefully shielded. The jury could also conclude that narcotic underlings do not drive around with $132,000 in cash in the trunk of their car.
 
 
 136
 Barnes' role in the December 29, 1976 transaction charged in Count 3 gave the jury an even clearer picture of his status. The convicted participants in this transaction were Barnes, Steven Baker, Steven Monsanto, James McCoy and Wallace Fisher. Under the rules of evidence above discussed, the declarations of the parties engaged in carrying out this concert of illegal action were admissible against their joint venturers. Fisher was Geronimo's entree into the Barnes' narcotics organization, and Geronimo testified that Barnes sent him and Fisher to Monsanto and that Monsanto was so informed. During the course of this transaction, Fisher in conversations that were tape-recorded, stated that Barnes was the "boss". Fisher stated that he didn't even address Barnes as "Nick" but always called him "Sir". When Geronimo subsequently complained to Barnes about the quality of the heroin received from Monsanto, Fisher stated that Geronimo should not have done it, that "you don't confront a boss like that".
 
 
 137
 At a later date, when Geronimo and Diaz went with Fisher to the Harlem River Motors Garage to purchase additional heroin from Steven Baker, Barnes and his bodyguards were in the garage. Fisher told Diaz that "Nicky Barnes oversees all transactions that take place in the garage". Statements such as these from a co-venturer who was attempting to make the venture a success were properly admitted. See, e. g., United States v. Johnson, 575 F.2d at 1347, 1358 (5th Cir. 1978); United States v. Bynum, 566 F.2d 914, 926 n.8 (5th Cir. 1978); Park v. Huff, 506 F.2d 849 (5th Cir.), Cert. denied, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975).
 
 
 138
 Putting all the evidence together and looking at the totality of the proof, the jury could fairly and logically have concluded beyond a reasonable doubt that Barnes was indeed a boss who supervised the activities of his co-conspirators and was guilty of violating Section 848.
 
 XI.
 STEVEN BAKER
 
 139
 Baker was convicted of conspiracy (Count 1) and of two substantive counts (Counts 3 and 7) of possessing and distributing narcotic drugs. He was sentenced to fifteen years' imprisonment on each of Counts 1 and 3 to run consecutively, fined $10,000 and given a special parole term of three years on both Counts 1 and 3. The sentence on Count 7, also 15 years and a three-year special parole term (plus $10,000), was to be served concurrently with the sentences on Counts 1 and 3. To the arguments of the other defendants, which he adopts, Baker adds three points particularly applicable to him: (1) illegality of a post-arrest statement; (2) prejudicial joinder; and (3) admission of prejudicial hearsay.
 
 The Post-Arrest Statement
 
 140
 Baker was arrested on March 15, 1977 and taken to DEA headquarters. Baker argues that after he and McCoy had been arrested, and while they were being taken to DEA headquarters in Manhattan, a DEA agent and others entered his apartment by means of keys taken from him, and seized drugs and other incriminating articles. Because these items were products of an illegal search, Baker argues, it was error for the trial court to refuse to suppress them. However, the Government made no attempt to introduce these seized items into evidence. Baker's claim, therefore, has to be and is, that he would not have made the admissions attributed to him (namely, that he dealt in drugs and was in a lot of trouble (Tr. 7772-7814)) but for his knowledge that the DEA had found incriminating items in his apartment hence they were "fruit of the illegal search". (Baker Br. 21).
 
 
 141
 While Baker was at DEA headquarters, he was shown a videotape of himself carrying bags contained mannite into his apartment building. It was under these circumstances that Baker said: "I have seen enough" (Tr. 7778); and "I'm not trying to hide anything. I'm guilty". (Tr. 7784). The trial court had heard the testimony of DEA agents, an Assistant United States Attorney, and Baker himself. The spontaneity of Baker's reaction to the videotape would appear to support the trial court's conclusion that Baker's statement "was not occasioned by reason of the fact that in advance of having given it, Steven Baker knew that his apartment was searched". (Pre-trial Tr. 373). The trial court further found that Baker's statement, insofar as it was given after Miranda warnings, "is admissible and that none of his rights have been violated . . . ." (Pre-trial Tr. 373). The trial court's decision is supported by the record; there was no error.
 
 Illegal Joinder
 
 142
 Baker's claim of illegal joinder is similar to that of his co-defendants, namely, that he was not part of a Barnes conspiracy. He identifies himself in his drug dealings only with Monsanto and McCoy and with them only in "isolated transactions". (Baker Br. 27). However, there was testimony from which a jury could infer that the transactions were more than isolated and that Baker was, in fact, a member of the Barnes conspiracy.
 
 
 143
 The evidence revealed that Baker and Monsanto operated as partners within the Barnes organization. Informant Wooden testified that Monsanto had introduced Baker as his partner when they were discussing a large importation of heroin. (Tr. 5382). Baker and Monsanto cooperated on the December 29 sale of a half-kilogram of heroin to Fisher and Geronimo. (Tr. 2130-2150, 4292-4305). Geronimo saw Baker, Monsanto, and Fisher in the Harlem River Motors Garage office with stacks of money on the desk. On the same day, Monsanto was later seen handing packages of white powder to people in a limousine. Baker told Fisher and Geronimo to come back later because they were doing bigger deals at the moment. Subsequently, Fisher said that Baker was supposed to come with the "package".
 
 
 144
 The connection to the Barnes conspiracy lies, in part, in the fact that it was Barnes who had directed Geronimo, who was trying to consummate a deal with Monsanto, to see Monsanto at the Harlem River Motors Garage at that time on December 29. Barnes said that Monsanto would be there for "other reasons". (Tr. 2128-29). Combined with Fisher's statement that Barnes oversaw all transactions in the Garage, these facts created a solid foundation for the jury's conclusion that Baker was part of the Barnes conspiracy. Additional support can be found in Baker's use of Hoby Darling Leasing Corporation automobiles. Finally, the cooperation between Baker and other members of the Barnes organization is revealed by the evidence that on February 25, 1977, when Fisher and Diaz were trying to consummate a transaction with Baker at the Garage, McCoy said that Baker had been warned to stay away because there was a lot of police activity in the area. McCoy intimated that Barnes had warned Baker. Tape recordings made by the "bug" in the Garage on February 25th reveal that Barnes was in the Garage and was engaged in narcotics-related activity.
 
 
 145
 Thus, Baker was properly joined as a defendant. For the same reasons, the hearsay statements of his co-conspirators were properly admitted against Baker.
 
 
 146
 We affirm Baker's convictions on all counts.
 
 XII.
 WALTER CENTENO
 
 147
 Centeno, who was found guilty of conspiracy on Count 1 and one substantive count for possession and distribution (Count 5),[22] claims that he participated only in a single transaction which is "insufficient to support his conviction of conspiracy". (Centeno Br. 14).
 
 
 148
 Despite this claim, there was testimony that Centeno had participated in washing $6,000 (Tr. 2250-53) and that he had been involved in the sale and delivery of 250 "quarters" of heroin to Promise Bruce. The evidence showed that Bruce had agreed to purchase 250 "quarters" of heroin from Hines and that Bruce was to receive samples in advance. On or about March 14, 1977, Centeno, who called himself "Chico Bob", came to Bruce at a bar and delivered the samples. Final delivery of the 250 "quarters" was made in the parking lot of a supermarket by Centeno, who had brought the "quarters" in the trunk of his car to Bruce and Mary Buckley, a DEA agent.
 
 
 149
 There is no question that Centeno was involved in the retail end of the Barnes narcotics operation. Furthermore, since he carried out a money wash in the summer of 1976, he had knowledge that a successful narcotics operation, like the one for which he was a retailer, involves a division of labor. The jury could properly infer that Centeno had knowledge of others above him in the chain of distribution and that he was dependent on their activities; thus, the jury could find that he had conspired with all the others in the organization. There was testimony that Hines, the principal in the sale of the "quarters", worked for Monsanto; Centeno was thus tied in to the very core of the Barnes conspiracy. (Tr. 6449).
 
 
 150
 With respect to Centeno's "Massiah " claim, there was no relationship between Centeno's identification of himself as "Chico Bob" and a previous (sealed) indictment. The substantive crime for which Centeno was here prosecuted was not consummated until the evening of March 14th, and was a part of a continuing investigation; hence, the circumstances of Centeno's revelation of his nickname were not within the doctrine of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Centeno's statements were clearly admissible.
 
 
 151
 We affirm Centeno's conviction on both counts.
 
 XIII.
 WALLACE FISHER
 
 152
 Wallace Fisher was convicted of conspiracy and three substantive counts (Counts 3, 4, and 11) charging sale and possession with intent to sell. He was sentenced to a term of up to eight years' imprisonment under the Youth Corrections Act. 18 U.S.C. §§ 5010, 5017(d).
 
 
 153
 Fisher adopts the arguments, applicable to him, made by the other appellants and urges three additional points of error as to him, namely: (1) that the court refused to charge the jury on entrapment; (2) that the court denied motions to sever his case; and (3) that the evidence was insufficient to prove that he was a member of an unlawful conspiracy.
 
 Entrapment
 
 154
 The law of entrapment in this Circuit is clear, and follows the teachings of Judge Learned Hand in United States v. Sherman, 200 F.2d 880, 882-83 (2d Cir. 1952). As Judge Hand there stated, an entrapment claim presents two issues:
 
 
 155
 "(1) did (a Government) agent induce the accused to commit the offense charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense. On the first question the accused has the burden; on the second the prosecution has it."
 
 
 156
 Although resolution of the issues raised in a claim of entrapment is largely factual, in deciding whether there Are disputed issues requiring jury determination, the trial court must be guided by the proof in the record at the time of making its decision to grant or deny a charge on the defense. The mere assertion of entrapment does not automatically require a charge thereon; nor does a mere showing that there was in fact Government inducement. Even if the accused had met his burden in showing inducement, once the Government has proved propensity by "substantial evidence" which stands uncontradicted, a charge on entrapment is properly denied. United States v. Licursi, 525 F.2d 1164, 1167-69 (2d Cir. 1975).
 
 
 157
 Fisher claims that his "entrapment" commenced on November 12, 1976, when Geronimo, on behalf of the Government, visited Fisher's home in an endeavor to "persuade" him to become part of a strategy to infiltrate the so-called Barnes organization. Since Fisher was not at home, the inducements of participation particularly the financial inducements were disclosed to one Gwendolyn Hardy, then living with Fisher, and to Fisher himself later that day. Fisher was somewhat reluctant, and he hesitated for several days. Fisher's counsel would depict Fisher as having been very much under the influence of Geronimo at that time, and as a person anxious to accommodate Geronimo and to do his bidding, as well as that of Government Agent Diaz. Certainly, the Government "inducement" was shown.
 
 
 158
 However, the Government claims that the undisputed evidence showed that Fisher had been in the narcotics business long before November 12, 1976 that from late 1974 or early 1975, he had been involved with his brother Guy Fisher in cutting and bagging drugs; and that he had trafficked in cocaine and angel dust prior to November 1976. This evidence, according to the Government, definitely established that Fisher had a propensity or predisposition to deal in drugs long before Geronimo approached him in November 1976. We agree.
 
 
 159
 Fisher's brief on the entrapment point omits many facts facts which the trial court had before it when it decided that a charge on entrapment was inappropriate. Indeed, as the Government points out, for a period of five years prior to November 1976, Fisher, according to Geronimo, had been "bagging and cutting drugs for his brother", and had told Geronimo about the substantial "amount of money to be made within the drug business itself". (Tr. 1859). When, in Spring 1975, Geronimo sought to buy heroin from Fisher, Fisher sought to buy some through Leon Johnson, but Johnson could only supply him with cocaine. (Tr. 1853-55). There was evidence that Fisher himself, prior to November 1976, had dealt in cocaine and angel dust (a narcotic). (Tr. 1859-63, 1890). And again, Geronimo testified that it was Fisher who had urged Geronimo to give "more thought" to becoming "involved in the drug business". (Tr. 1905). It was against this background, according to the evidence, that Geronimo, in November 1976, had sought out Fisher.
 
 
 160
 Fisher's prior activities were proved by evidence that stood uncontradicted in the record. Indeed, aside from Geronimo's testimony, there were taped statements made by Fisher himself, uncontradicted, to show that his involvement was extensive and willing. In view of this evidence, Fisher's initial reluctance, or desire to have time to "think it over", was insufficient, of itself, to negate the evidence of predisposition. See United States v. Reed, 526 F.2d 740, 743 (2d Cir. 1975), Cert. denied, 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976). Since there was no evidence to contradict the Government's evidence of propensity, on the facts before the trial court, Judge Werker was justified in denying a charge on entrapment. United States v. Licursi, supra, 525 F.2d at 1167-69.
 
 Severance
 
 161
 In an endeavor to destroy Fisher's credibility (because much of the evidence implicating the co-defendants had come through Fisher's actions and declarations), co-defendants' counsel argued to the jury that Fisher's record showed that he was a liar, a cheat, a "con man", and a "dupe", willing to serve Geronimo's ends. The jury was told that Fisher had previously been arrested on a drug charge. On the basis of what has been described as this "incessant character assassination" (Fisher Br. 26), Fisher's counsel, on several occasions during trial, sought a severance, claiming prejudice to his client. The trial court denied the severance. Fisher claims an abuse of discretion.
 
 
 162
 In a multi-defendant narcotics trial it is not unusual for some defendants to claim that others are more culpable, and that they should be acquitted, even if others are found to be guilty. Here, it was in the interest of all of the defendants, Including Fisher himself, to try to establish his unreliability.
 
 
 163
 There is no way to avoid some "spill-over effect" of testimony in such multi-defendant trials except through the judge's charge. The procedural rules with respect to joinder have been drafted with judicial economy in mind, as well as the protection of individual defendants' rights. In this case, fifteen trials could have been required. Certainly, to have fifteen trials was not required. Indeed, the decisions as to joinder vary as do the facts. The discriminating process of jury analysis can only be tested by the results. Here, some defendants were acquitted of various charges; others were convicted. If testimony spilled over, it did not contaminate all. Judge Werker's decision to deny a severance was thus a proper exercise of his discretion.
 
 Insufficiency of the Evidence
 
 164
 Finally, Fisher argues that the evidence indicates only that he was a member of a "purchasing team", and hence was not a seller of heroin. This, of course, would not excuse him from conspiratorial liability. A drug conspiracy customarily involves both the purchase and sale of drugs.
 
 
 165
 Further, the Government showed that Fisher's involvement was more far-ranging than simply having conspired with Government agents, for which no conspiratorial liability could be imposed. The jury could properly infer that Fisher had agreed with other members of the conspiracy to promote its ends. Fisher's comments to Geronimo revealed that he was fully aware of the scope and nature of the conspiracy. His actions as a "middleman" in three transactions with different "arms" of the conspiracy constituted sufficient evidence of knowledgeable participation in the operations of the conspiracy with an expectation of benefiting from them.
 
 
 166
 Fisher's convictions are in all respects affirmed.
 
 XIV.
 JOHN HATCHER
 
 167
 Hatcher was convicted of conspiracy (Count 1) and of a substantive count for possession and distribution of 457.42 grams of heroin (Count 4).
 
 
 168
 Hatcher argues that the Government failed to establish by competent evidence his participation in the Barnes conspiracy and that certain evidence against him was improperly admitted. His claim that he was prevented from calling witnesses who would have established the existence of a Stepeney-Franklin organization at Harlem River Motors Garage has already been addressed in Part IV Supra. Hatcher's other claims have no merit.
 
 Proof of Participation in the Conspiracy
 
 169
 Hatcher's argument is that there was no evidence of his participation in the conspiracy other than the March 11, 1977 sale of heroin to Fisher and Diaz. However, strong evidence was introduced at trial which supports the jury's verdict.
 
 
 170
 The evidence tended to show that Hatcher was in the business of selling wholesale quantities of heroin on a continuing basis. Apart from the March 11 sale, there was testimony that he offered, on December 23, 1976, to sell Geronimo and Fisher a half-kilogram of heroin for $26,000. At that time he showed Geronimo a sample which he pulled from beneath the seat of a Mercedes parked in the Harlem River Motors Garage.
 
 
 171
 The jury could properly infer that Hatcher had knowledge of the activities of other conspirators. He was at the Harlem River Motors Garage on December 29, 1976, when Monsanto sold heroin to Fisher and Geronimo, the same night that Geronimo saw packages of white powder being transferred to a car in the Garage. Moreover, he carried out his own heroin sale at the same locale as his co-conspirators.
 
 
 172
 The jury could also conclude that Hatcher benefited from the activities of other Barnes conspiracy participants. Hatcher operated 13 automobiles registered to Hoby Darling Leasing Corporation during the course of the investigation, benefiting from an operation which was run by the conspirators in aid of their illicit business. In addition to this objective evidence, there was testimony that Fisher believed Hatcher to be the owner of Harlem River Motors Garage, the chief business of which seems to have been the sale of heroin. When examined in its entirety, the evidence justifies Hatcher's conviction for conspiracy.
 
 
 173
 Admission of Allegedly Inadmissible Evidence
 
 
 174
 The first bit of evidence challenged by Hatcher is Fisher's statement to Diaz and Geronimo that "Nicky oversees all transactions (sic) that take place in the garage" (Geronimo version) (Tr. 2356) or "Nicky Barnes was into everybody's action" (Diaz version) (Tr. 4419), and that this statement was allegedly so unreliable that its admission was in violation of the Sixth Amendment Confrontation Clause. We conclude that this statement was not so lacking in indicia of reliability as to violate Hatcher's constitutional rights. Fisher's and Geronimo's credibility and the weight to be given the statement were questions for the jury.
 
 
 175
 Hatcher also attacks the admission of Diaz's testimony that the letters "BO", a nickname for Hatcher, appeared on the wrapping of the package containing one-half kilogram of heroin which Hatcher sold to Geronimo and Diaz. The Government argued in summation that this writing established that Hatcher was the source of the heroin given by Fisher to Diaz on March 11, 1977. Diaz did not know who had written the notation or the circumstances under which it had been written. Therefore, argues Hatcher, admission of Diaz's testimony that this was Bo's package and that he was the source constitutes reversible error on the grounds that it was hearsay and in violation of the Confrontation Clause.
 
 
 176
 There was testimony, however, that Geronimo had discussed the sale of one-half kilogram of heroin for $25,000 with Hatcher and that the method of delivery (in Fisher's Corvette) had been pre-arranged. The package containing the heroin indeed bore the letters "BO", as related by Diaz. The evidence in no way violated Hatcher's rights. It provided circumstantial proof that Hatcher was the source.
 
 
 177
 We affirm Hatcher's conviction on both counts.
 
 XV.
 JOSEPH HAYDEN
 
 178
 Joseph "Jazz" Hayden, convicted of conspiracy on Count 1, was sentenced to fifteen years' imprisonment, a $25,000 fine, and special life parole. He attacks his conviction on the ground that the proof was insufficient to establish his participation in the conspiracy beyond a reasonable doubt. He also claims to have been deprived of his right to call witnesses in his behalf, because of a direction by the trial court that, if his counsel were to testify, he would have to obtain other trial counsel on very short notice.
 
 Proof of Participation in the Conspiracy
 
 179
 Diaz carried out a $47,000 money "wash" for Hayden on January 19, 1977. At that time according to Diaz, he and Hayden discussed the prior negotiations concerning Fisher's and Geronimo's attempts to purchase heroin from Hayden. In a later conversation, Hayden quoted Diaz a price of $25,000 or $26,000 for a half-kilogram of heroin and said he would have to consult "his Boss". These conversations were an adequate basis for the jury to infer that Hayden was in the narcotics business and had to "wash" the receipts from that business.
 
 
 180
 Hayden's counsel argued at trial that Hayden undertook to change $47,000 in small bills into large denominations as a result of his ownership of several Harlem "after hours" clubs which generated a large cash flow of small denomination bills. To accomplish this conversion, he used DEA Agent Diaz as a dupe who would perform the service without a fee. Hayden's counsel had an opportunity to present his version in his summation, as did the Government. The jury apparently chose the Government's view. The evidence was certainly sufficient to sustain their choice.
 
 
 181
 The evidence tended to support the Government's claim that after Guy Fisher was jailed, Hayden became one of Barnes' chief lieutenants. Hayden's tax return for 1976 reported $136,460 as "miscellaneous income" a substantial increase over the previous year's $67,500. These figures corresponded with a decrease in Guy Fisher's earnings resulting from his incarceration. There was evidence that Barnes and Hayden together arranged the December 16, 1976 "wash" of $10,000. In addition, Hayden drove automobiles registered to Hoby Darling Leasing Corporation and to Kingdom Auto Leasing Corporation. Since "money washing" is integral to the success of a narcotics conspiracy and since there was evidence that Hayden should have known of the activities of other conspirators, Hayden's conviction of conspiracy was proper.
 
 Right to Call Witnesses
 
 182
 In the § 3500 material relating to Geronimo's testimony which the Government turned over to defense counsel there appeared an assertion by Geronimo that he had information that Hayden's counsel had allegedly bribed a state judge in an unrelated case. Hayden's counsel advised the trial court that he wished to present evidence, including his own testimony, to show that Geronimo was lying and that such proof would accentuate defense arguments that Geronimo was an unbelievable witness.[23]
 
 
 183
 The Government advised Hayden's counsel that it had no intention of bringing out any bribery issue on direct examination. However, counsel stated that he wished to go into the matter upon cross-examination. It was against this backdrop that the trial judge offered Hayden a three-day adjournment to obtain new counsel in the event that his then-counsel chose to testify, although he expressed the opinion that counsel's proposed testimony would be so collateral as not to be admissible. Such a conclusion, in our opinion, would have been justified and within the court's discretion. As to the shortness-of-time argument, Hayden's counsel did not commence his cross-examination of Geronimo until some eleven days after the § 3500 disclosure. Furthermore, counsel's decision not to testify was made after a strategy discussion which included all defense counsel. No reversible error is to be found in this situation.
 
 
 184
 In sum, Hayden's conviction is affirmed.
 
 XVI.
 WAYMIN HINES
 
 185
 Hines was convicted of conspiracy (Count 1) and of a substantive count of possession and distribution of heroin (Count 5). He was sentenced to consecutive 15-year terms of imprisonment, fines of $10,000 on each count, and a special parole term of three years. He makes the argument, applicable uniquely to him, that he was deprived of his Sixth Amendment rights to the assistance of counsel and to confront witnesses by: (1) the prosecution's failure to disclose prior to trial its intent to use a former client of Hines' trial counsel as a prosecution witness; (2) the trial court's failure to conduct a hearing into the nature of the conflict between the witness and Hines' counsel, to inform Hines of the problem, or to give Hines an opportunity to express his views; and (3) the trial court's refusal to permit Hines' counsel to seek a waiver of the attorney-client privilege from his former client so as to permit him to cross-examine the witness effectively. He also attacks his conspiracy conviction and the admission of certain evidence.
 
 Trial Counsel's Former Client as a Witness
 
 186
 Midway through the trial, the Government advised the defense that it would call Jerome L. Christian as a witness. Christian had been represented in a related criminal matter by Hudson Reid, Esq., who was then acting as trial counsel for Hines. The previous representation had involved charges that Christian in 1974 had sold narcotics to DEA agents.
 
 
 187
 The reason given by the Government for not disclosing its intention to call Christian at an earlier date was that, until the night before he testified, there was a substantial probability that Christian would refuse to testify. The prosecutor gave an assurance that "(t)here will be absolutely no testimony from Mr. Christian about Waymin Hines in any way" only against the defendant Guy Fisher. (Tr. 5611).
 
 
 188
 After an order of immunity had been obtained and a Criminal Justice Act attorney had been appointed, Christian proceeded to testify for 122 pages of the transcript, including direct, cross, redirect and recross. A reading thereof discloses no reference to Hines, directly or indirectly.
 
 
 189
 Reliance upon such recent cases as Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); and Salomon v. LaVallee, 575 F.2d 1051 (2d Cir. 1978) is inapposite. These cases involved dual representation with obvious actual or potential conflicts. Even in such situations (which is not the case here), "some specific instance of prejudice, some real conflict of interest, resulting from a joint representation must be shown to exist . . . ." United States v. Carrigan, 543 F.2d 1053, 1055 (2d Cir. 1976).
 
 
 190
 Counsel for Hines was not precluded from cross-examining Christian. Nor does he point out the field into which he felt he was precluded from entering. It is to be doubted that he would have sought to open up a relationship between his client and Guy Fisher. In the absence of guidance by counsel as to any possible prejudice to Hines, our review of the record discloses none.
 
 Conspiracy-Related Claims
 
 191
 Hines claims that although one conspiracy was charged in the indictment, several were proved at trial, and that this variance was prejudicial. As noted earlier, there was substantial evidence which enabled the jury to conclude that one conspiracy had been proved. Hines operated three Jaguars registered to Hoby Darling Leasing Corporation during the investigation. Geronimo testified to his observation of Hines' activities with Guy Fisher, including one transaction for a package of white powder outside the Kingdom Garage. This independent evidence, in connection with the evidence of Guy Fisher's role in the Barnes conspiracy, tied Hines into the single Barnes conspiracy.
 
 
 192
 Hines also challenges the admission of two allegedly hearsay statements which Geronimo repeated during his testimony. Angel Brown told Geronimo that she worked for Gary Saunders, who in turn worked for Hines and Guy Fisher and that she received from Saunders up to 3000 heroin quarters a week to sell through her crew of women retailers. Geronimo further testified that he had seen a man named David receive a paper bag from Hines. David then told Geronimo and Fisher that he had just picked up 1500 quarters of heroin from Hines.
 
 
 193
 Geronimo's independent observations of the connections among Hines, Angel Brown, Gary Saunders, and David satisfy the test of United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), Cert. denied sub nom. Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Geronimo testified to a transaction involving Guy Fisher, Hines, and Saunders. Later, he saw Saunders give Brown envelopes of white powder. Similar observations justify admission of David's statement.
 
 
 194
 We find Hines' other arguments, including the claim that the hearsay statements were not in furtherance of the conspiracy, to be without merit and we affirm his conviction.
 
 XVII.
 LEON JOHNSON
 
 195
 Johnson was convicted of conspiracy (Count 1) and of two substantive counts (Counts 12 and 13), each involving separate sales of cocaine. He was sentenced to fifteen years' imprisonment on Count 1, plus a $10,000 fine, and three years' special parole; and a fifteen year sentence and three years' special parole on Count 12. A similar sentence on Count 13 was to run concurrently with the sentence on Count 12.
 
 
 196
 Apart from joining the arguments made by the other defendants in their joint brief, Johnson does not attack his convictions on Counts 12 and 13. He challenges his conviction for conspiracy on the grounds that there was no evidence connecting him to the Barnes conspiracy and that if he was guilty of conspiracy, it was a conspiracy different from the single conspiracy charged in the indictment. He was the only defendant who requested the trial court to instruct the jury with respect to proof of multiple conspiracies where a single conspiracy was charged. We conclude that there was sufficient evidence to support the jury's verdict that Johnson was a member of the Barnes conspiracy.
 
 
 197
 The indictment charged a conspiracy to sell heroin And cocaine. Besides the proof that Johnson sold cocaine to Promise Bruce, there was evidence that allowed the jury to conclude that Johnson negotiated on Barnes' behalf to buy cut from Bruce. Bruce testified that he discussed a proposed sale of cut with Johnson on January 10, 1977, at the Scales Social Club. Johnson explained to Bruce "that Nicky wanted numbers and prices and amounts and that Nicky is not going to deal with nobody else . . . ." (Tr. 6422-23). Several weeks earlier Johnson had received a sample jar of quinine from Bruce and had promised that he (Johnson) would give the jar to Nicky and let him check it out. (Tr. 6415). Johnson's act of removing himself from the negotiation with the suggestion that Bruce deal directly with Barnes did not erase his participation in the conspiracy as Barnes' agent. In addition, there was evidence that Johnson operated automobiles registered to Hoby Darling Leasing Corporation. The above facts combine to tie Johnson to the single Barnes conspiracy described elsewhere in this opinion.
 
 
 198
 Finding no merit in Johnson's other arguments with respect to his conspiracy conviction, we affirm his convictions.
 
 XVIII.
 JAMES McCOY
 
 199
 McCoy was convicted of conspiracy (Count 1) and substantive offenses for possession and distribution of heroin (Counts 3 and 7) and for possession of firearms (Count 8). He was sentenced to 15 years and three years special parole to run concurrently as to Counts 1, 3 and 7, and to five years on Count 8 the gun possession count.
 
 
 200
 McCoy raises a special point applicable only to him: the trial court's failure to suppress guns found in a locked glove compartment of the car he had been driving at the time of his arrest. The car, which was subject to forfeiture,[24] was taken to a DEA garage where, some three days later, as part of a warrantless inventory, the glove compartment was broken into, and two guns and various capsules were discovered. The admission into evidence of the guns and narcotics, McCoy claims, was highly prejudicial to his case. McCoy would distinguish his situation from that before the Supreme Court in South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), because in Opperman the glove compartment was "unlocked". However, in Opperman, the car itself was locked. Where there is a duty to "inventory", there should be a concomitant privilege to use reasonable means to gain access for this purpose. The trial court properly denied the motion to suppress.
 
 
 201
 In any event, the guns seized in this inventory procedure were the subjects of Counts 9 and 10 of the indictment, on which McCoy was acquitted. Even if improperly seized, the admission of these guns was harmless. McCoy's conviction on Count 8, a gun possession charge, stemmed not from the guns recovered from the glove compartment, but rather from the gun found on his person when he was arrested.
 
 XIX.
 STEVEN MONSANTO
 
 202
 Monsanto was convicted of conspiracy (Count 1) and of a substantive offense for possession and distribution of heroin (Count 3). He was sentenced to 15 years on each count plus a $10,000 fine on Count 1 and three years' special parole on Counts 1 and 3.
 
 
 203
 Monsanto's main point relates to the trial court's admission of evidence of Monsanto's participation in a plan to import 300 pounds of heroin and to assemble some 50 guns, including sawed-off shotguns, machine guns and hand guns, the proof of which, he claims, was highly inflammatory and prejudicial, the prejudice far exceeding its probative value. Monsanto argues that the prosecution wilfully failed to reveal its intention to offer this proof, thus taking Monsanto by surprise. The Government replies that, consistent with the trial court's pre-trial ruling on non-disclosure of Government witness identity, for the safety of the informant, disclosure was withheld.
 
 
 204
 Monsanto would fit the evidence of the heroin importation scheme into the category of inadmissible "similar crime evidence". However, in view of Monsanto's trafficking in the sale of heroin, this proof would seem to be more closely related to a furtherance of the conspiracy. Its probative value was unquestionable. Certainly, the evidence of the importation scheme was relevant to the issue. The weapons could certainly have been indicative of "tools of the trade". Judge Werker's decision to admit the evidence was proper.
 
 
 205
 Other points relating to sentencing, the Voir dire of the jury and the evaluation of a witness' testimony have been discussed elsewhere, and are without merit.
 
 XX.
 LEONARD ROLLOCK
 
 206
 Rollock was convicted of conspiracy on Count 1 and of one substantive charge for possession and distribution of heroin (Count 11). He was sentenced on Counts 1 and 11 to fifteen years' imprisonment and three years' special parole, the sentences to run concurrently. Rollock characterizes the sale charged in Count 11 as an "isolated transaction" which was insufficient to prove that he was a member of the conspiracy charged. We disagree.
 
 
 207
 The events which occurred in connection with the sale for which Rollock was convicted demonstrate his participation in the conspiracy. During negotiations with Rollock, Geronimo and Fisher agreed that they would purchase heroin from Rollock at the Kingdom Garage, a center for the narcotics activities of other defendants, on November 29, 1976. However, Rollock arrived late and said that he woke up late, had missed a meeting with "Nick", and did not have the package with him. They set an appointment to try again at the Two Cousins Lounge that evening. During the afternoon of November 29th Fisher and Geronimo checked on the source of the heroin and reported to Diaz that it was coming from "Jazz" (Hayden) and was "blessed" by "Nicky". (Tr. 2054-55; 4242-43). The transaction was consummated that evening. Subsequently, Rollock told Geronimo and Fisher that "his people" thought that the purchase money was marked. Hayden later told Fisher and Geronimo that they had paid too much. With the evidence concerning this transaction before it, the jury could properly have inferred that Rollock was a member of the Barnes organization.
 
 
 208
 We affirm Rollock's convictions on both counts.
 
 SUMMARY
 In summary, we hold as follows:
 BARNES
 
 209
 We affirm his convictions on Counts 1, 2 and 3.
 
 BAKER
 
 210
 We affirm his convictions as to Counts 1, 3 and 7.
 
 CENTENO
 
 211
 We affirm his convictions on Counts 1 and 5.
 
 WALLACE FISHER
 
 212
 We affirm his convictions on Counts 1, 3, 4 and 11.
 
 HATCHER
 
 213
 We affirm his convictions on Counts 1 and 4.
 
 HAYDEN
 
 214
 We affirm his conviction on Count 1.
 
 HINES
 
 215
 We affirm his convictions on Counts 1 and 5.
 
 LEON JOHNSON
 
 216
 We affirm his convictions on Counts 1, 12 and 13.
 
 MCCOY
 
 217
 We affirm his convictions on Counts 1, 3, 7 and 8.
 
 MONSANTO
 
 218
 We affirm his convictions on Counts 1 and 3.
 
 ROLLOCK
 
 219
 We affirm his convictions on Counts 1 and 11.
 
 MESKILL, Circuit Judge, dissenting:
 
 220
 I respectfully dissent. I am troubled by the implications of today's decision and the uses to which it may be put. "Cases of notorious criminals like cases of small, miserable ones are apt to make bad law. . . . The harm in the given case may seem excusable. But the practices generated by the precedent have far-reaching consequences that are harmful and injurious beyond measurement." Abel v. United States, 362 U.S. 217, 241-42, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960) (Douglas, J., dissenting). In my judgment, the district court's decision not to disclose the names and addresses of prospective jurors and at the same time to prohibit inquiry into their ethnic and religious backgrounds on the Voir dire was error. I would reverse the judgments of conviction and remand for a new trial.
 
 
 221
 During a pre-trial conference held on September 12, 1977, the trial judge announced, Sua sponte, the procedures he had decided to follow in connection with the Voir dire examination of prospective jurors. He said first that a panel of 150 prospective jurors had been drawn, that they would be assigned numbers 1 to 150, and that their names would not be disclosed to counsel. He also said that the street addresses of the prospective jurors would not be disclosed, nor would their neighborhoods, police precincts, or firehouse or school districts. He did promise, though, to give counsel "a general impression as to where (the jurors) reside."[1] When questioned by counsel, the judge said that he would, in addition, prohibit inquiry into the ethnic and religious backgrounds of the prospective jurors, explaining that, "I do not feel that those are appropriate subjects for questioning."
 
 
 222
 The following week the judge informed counsel that he had decided to sequester the jury.[2] Counsel inquired whether, in view of the sequestration of the jury, the names, addresses, and ethnic and religious backgrounds of the jurors would still be withheld; the judge said they would be. When pressed for an explanation, the judge offered the following:
 
 
 223
 I think the jurors are entitled to their privacy and I think their families are entitled to their privacy.
 
 
 224
 In my view of the law, the law states that no juror shall be disqualified by reason of race, color or creed, and in my view of the law he could not be challenged on the basis of race, color or creed.[3]
 
 
 225
 The jury was selected on September 26, 27, 28 and 29, and trial began on September 29. The jurors knew that their names and addresses were being withheld.[4]
 
 
 226
 On this appeal the government contends that the district court's decision to prohibit inquiry into the names, residences, and ethnic and religious backgrounds of the prospective jurors was both lawful and proper. At the time of the district court's announcement, however, and during the course of the discussion that followed, the government was noticeably silent. Indeed, at no time were the views of the United States Attorney on this matter either sought or expressed, and every time counsel for the defendants sought to challenge the district court's ruling, either orally or in writing, their requests were sharply denied. The appellants now argue that the cumulative effect of the trial judge's decision was so significant that it denied them the ability to exercise meaningfully their right to peremptory challenge. I agree.
 
 
 227
 The Sixth Amendment provides that "(i)n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . ." The right to an "impartial jury" is also grounded on principles of due process, Ristaino v. Ross, 424 U.S. 589, 595 n. 6, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and it is a right that may be secured by the exercise of our "supervisory powers," See Ristaino v. Ross, supra, 424 U.S. at 597 n. 9, 96 S.Ct. 1017; Hamling v. United States, 418 U.S. 87, 140, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). Like so many constitutional requirements, however, it is no easy task precisely to define this mandate. "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." United States v. Wood, 299 U.S. 123, 145-46, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936). At the same time, the constitutional right to an impartial jury "carries with it the concomitant right to take reasonable steps designed to insure that the jury is impartial." Ham v. South Carolina, 409 U.S. 524, 532, 93 S.Ct. 848, 853, 35 L.Ed.2d 46 (1973) (Marshall, J., concurring and dissenting). Under our system of criminal justice, several devices are available to serve that end. See, e. g., Groppi v. Wisconsin, 400 U.S. 505, 509-11, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971) (change of venue); Sheppard v. Maxwell, 384 U.S. 333, 357-63, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (control of publicity regarding trial). Of the available devices, however, the jury challenge is perhaps the most important, Ham v. South Carolina, supra, 409 U.S. at 532, 93 S.Ct. 848 (Marshall, J., concurring and dissenting), whether that challenge be "for cause," where actual bias is admitted or presumed, or "peremptory," where bias is suspected or inferred. See Lewis v. United States, 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892) ("The right of challenge comes from the common law with the trial by jury itself, and has always been held essential to the fairness of trial by jury."). The ability of the defendants in this case to exercise the peremptory challenge is at the center of this appeal.
 
 
 228
 The peremptory challenge is "an arbitrary and capricious species of challenge," one that can be based on "sudden impressions and unaccountable prejudices." Lewis v. United States, supra, 146 U.S. at 376, 13 S.Ct. at 138, Quoting 4 Blackstone, Commentaries 353; Pointer v. United States, 151 U.S. 396, 408, 412, 14 S.Ct. 410, 38 L.Ed. 208 (1894). "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." Swain v. Alabama, 380 U.S. 202, 220, 85 S.Ct. 824, 836, 13 L.Ed.2d 759 (1965). It permits rejection of a prospective juror "for a real or imagined partiality." Id. at 220, 85 S.Ct. at 836. See also United States v. Newman, 549 F.2d 240, 249 (2d Cir. 1977). In sum, it is a right given "to be exercised in the party's sole discretion." Frazier v. United States, 335 U.S. 497, 505, 69 S.Ct. 201, 206, 93 L.Ed. 187 (1948). The purpose of the right of peremptory challenge is to aid the parties in securing a fair and impartial jury by affording them "an opportunity beyond the minimum requirements of fair selection to express an arbitrary preference among jurors properly selected and fully qualified to sit in judgment on (their) case." Id. at 506, 69 S.Ct. at 206. It is not so much a right to select as it is a right to reject jurors. Pointer v. United States, supra, 151 U.S. at 412, 14 S.Ct. 410.
 
 
 229
 It is, of course, true that "(t)here is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges to defendants in criminal cases; trial by an impartial jury is all that is secured." Stilson v. United States, 250 U.S. 583, 586, 40 S.Ct. 28, 30, 63 L.Ed. 1154 (1919). But Congress has chosen to grant the right, See Fed.R.Crim.P. 24(b); 28 U.S.C. § 1866(c)(3), and it is an extremely important one.
 
 
 230
 Experience has shown that one of the most effective means to free the jury-box from (jurors) unfit to be there is the exercise of the peremptory challenge. The public prosecutor (and, presumably, the defendant) may have the strongest reasons to distrust the character of a juror offered, from his habits and associations, and yet find it difficult to formulate and sustain a legal objection to him. In such cases, the peremptory challenge is a protection against his being accepted.
 
 
 231
 Hayes v. Missouri, 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887). More recent scholarship has tended to substantiate these earlier observations. See, e. g., Zeisel & Diamond, The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court, 30 Stan.L.Rev. 495 (1978). Given this reality, the right of peremptory challenge has been held to be not only "one of the most important of the rights secured to the accused," Pointer v. United States, supra, 151 U.S. at 408, 14 S.Ct. at 414, but also "a necessary part of trial by jury," Swain v. Alabama, supra, 380 U.S. at 219, 85 S.Ct. at 835, and "essential in contemplation of law to the impartiality of the trial," Lewis v. United States, supra, 146 U.S. at 378, 13 S.Ct. at 139, Quoting Lamb v. State, 36 Wis. 424 (1874). See United States v. Newman, supra, 549 F.2d at 250 n. 8:
 
 
 232
 The right to peremptory challenges is of great importance, both to the Government and to the defendants but mostly to the defendants . . . . (It is) one of the greatest safeguards the law has provided for a fair trial.
 
 
 233
 See also Swain v. Alabama, supra, 380 U.S. at 242, 85 S.Ct. at 847 (Goldberg, J., dissenting) ("the peremptory challenge has long been recognized primarily as a device to protect Defendants ") (emphasis in original).
 
 
 234
 Because of the importance of this right to defendants, "(a)ny system for the empanelling of a jury that pre(v)ents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." Pointer v. United States, supra, 151 U.S. at 408, 14 S.Ct. at 414; St. Clair v. United States, 154 U.S. 134, 148, 14 S.Ct. 1002, 38 L.Ed. 936 (1894). Thus, a defendant has the right "to exercise his full right of peremptory challenge," United States v. Marchant, 12 Wheat. 480, 484, 25 U.S. 480, 484, 6 L.Ed. 700 (1827), and "it must be exercised with full freedom, or it fails of its full purpose," Lewis v. United States, supra, 146 U.S. at 378, 13 S.Ct. at 139, Quoting Lamb v. State, supra. "The denial or impairment of the right is reversible error without a showing of prejudice." Swain v. Alabama, supra, 380 U.S. at 219, 85 S.Ct. at 835. Under this standard, it is my view that the trial judge erred and that reversal is required.
 
 
 235
 A defendant "cannot be compelled to make a peremptory challenge until . . . an opportunity (has been given) for such inspection and examination of (each proposed juror) as is required for the due administration of justice." Pointer v. United States, supra, 151 U.S. at 408-09, 14 S.Ct. at 415. The result of this requirement has been that "(t)he Voir dire in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories, and the process of selecting a jury protracted." Swain v. Alabama, supra, 380 U.S. at 218-19, 85 S.Ct. at 835. See also Lurding v. United States, 179 F.2d 419, 421 (6th Cir. 1950) (defendant is "entitled to probe for the hidden prejudices of the jurors"). Especially in cases attended by extensive publicity, as this case apparently was, there is a duty on the part of trial courts to conduct the Voir dire with "painstaking care." United States v. Kahaner, 204 F.Supp. 921, 924 (S.D.N.Y.1962) (Weinfeld, J.), Aff'd, 317 F.2d 459 (2d Cir.), Cert. denied, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963). Considering what is at stake for defendants in criminal trials, this is as it should be the "due administration of justice" can allow no less. Just as in cases dealing with the scope of Voir dire as it relates to "for cause" challenges, See, e. g., United States v. Grant, 494 F.2d 120, 123 (2d Cir.), Cert. denied, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79 (1974), it must be acknowledged that the trial court has a great deal of discretion in these matters, but it is a discretion "subject to the essential demands of fairness," Aldridge v. United States, supra, 283 U.S. at 310, 51 S.Ct. at 471. Broad as the trial judge's discretion is, I think it was abused in this case.[5]
 
 
 236
 When a defendant requests a trial judge to ask on Voir dire a question the answer to which may form the basis for a "for cause" challenge, the defendant bears the burden of convincing the court that the question or the resulting information is "relevant" to the case at hand. Ham v. South Carolina, supra, 409 U.S. at 532-33, 93 S.Ct. 848 (Marshall, J., concurring and dissenting). It is in this manner that the defendant is able to discover "actual bias" and, based on that discovery, exercise a challenge "for cause." Dennis v. United States, 339 U.S. 162, 171-72, 70 S.Ct. 519, 94 L.Ed.2d 734 (1950). This determination of relevance is quite properly assigned to the sound discretion of the trial judge. This is not the standard, however, when what is being sought is information upon which to base a peremptory challenge.[6] United States v. Jefferson, 569 F.2d 260, 261-62 (5th Cir. 1978); United States v. Dellinger, 472 F.2d 340, 367 (7th Cir. 1972), Cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); United States v. Lewin, 467 F.2d 1132, 1137 (7th Cir. 1972); Kiernan v. Van Schaik, 347 F.2d 775, 779-80 (3d Cir. 1965); Bailey v. United States, 53 F.2d 982, 984 (5th Cir. 1931); Beatty v. United States, 27 F.2d 323, 324 (6th Cir. 1928). This reflects the very nature of the peremptory challenge a challenge "exercised on grounds normally thought irrelevant to legal proceedings." Swain v. Alabama, supra, 380 U.S. at 220, 85 S.Ct. at 836. Thus, defendants should be permitted sufficient inquiry into surface information as well as the background and attitudes of prospective jurors to enable them to exercise intelligently their peremptory challenges.[7] See United States v. Harris, 542 F.2d 1283, 1295 (7th Cir. 1976), Cert. denied, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); United States v. Dellinger, supra, 472 F.2d at 367-68; United States v. Lewin, supra, 467 F.2d at 1137-38; United States v. Esquer, 459 F.2d 431, 434 (7th Cir. 1972), Cert. denied, 414 U.S. 1006, 94 S.Ct. 366, 38 L.Ed.2d 243 (1973); Kiernan v. Van Schaik, supra, 347 F.2d at 779, 781; Spells v. United States, 263 F.2d 609, 611 (5th Cir.), Cert. denied, 360 U.S. 920, 79 S.Ct. 1439, 3 L.Ed.2d 1535 (1959); Bailey v. United States, supra, 53 F.2d at 984; Beatty v. United States, supra, 27 F.2d at 324; ABA Standards, Trial by Jury § 2.4 (1968) & Commentary at 66-67. When it is generally recognized that counsel for criminal defendants often base peremptory challenges on certain types of information about prospective jurors, information such as race, nationality and religion, I would, in the absence of persuasive countervailing considerations, hold that a defendant is entitled to have asked on Voir dire questions which are reasonably necessary to the discovery of that information. As expressly held in Swain v. Alabama, supra, "fairness of trial by jury requires no less." 380 U.S. at 221, 85 S.Ct. at 836. See also United States v. Jefferson, supra, 569 F.2d at 262 (prior jury service). It is in light of these considerations that I evaluate the district court's refusal to disclose the names and addresses of the prospective jurors and his refusal to inquire into the jurors' ethnic and religious backgrounds.
 
 
 237
 Section 3432 of Title 18 provides that "(a) person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with . . . a list of the veniremen . . . stating the place of abode of each venireman . . . ." The case before us now is not a capital case but, nevertheless, it is the normal and better practice to provide to the government and the accused a list of prospective jurors and their addresses.[8] ABA Standards, Trial by Jury § 2.2 (1968) & Commentary at 60-61. Such lists enable the parties, if they choose, to engage in independent investigations of prospective jurors, thus aiding the exercise of challenges and narrowing the required scope of the Voir dire.[9] These lists, and the possibility of investigation, serve another important function as well. They may deter prospective jurors from misrepresenting or minimizing embarrassing or possibly disqualifying aspects of their backgrounds. See Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1932); United States v. Floyd, 496 F.2d 982, 990 (2d Cir.), Cert. denied, 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974); Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan.L.Rev. 545, 547, 554 (1975).
 
 
 238
 Congress, when it passed the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 Et seq., directing each federal judicial district to devise a "plan" for the random selection of grand and petit jurors, required that the Plans "fix the time when the names drawn from the qualified jury wheel shall be disclosed to parties and to the public." 28 U.S.C. § 1863(b)(8). At the same time, Congress provided that "(i)f the plan permits these names to be made public, it may nevertheless permit the chief judge of the district court, or such other district judge as the plan may provide, to keep these names confidential in any case where the interests of justice so require." Id. Article VII-B of the Southern District's Plan provides as follows:
 
 
 239
 The Clerk shall prepare separate lists of those assigned to each pool. These lists shall not be made public until the jurors have been summoned and have appeared at the Court House. Even then the Chief Judge may order the names kept confidential if the interests of justice so require.
 
 
 240
 Here, assuming that the trial judge had the authority to keep the names from the parties, and noting that there was no finding that the "interests of justice" required juror anonymity, it is nevertheless my view that, as to the withholding of the jurors' names alone, the trial judge's actions would not require reversal. The appellants do not argue otherwise.
 
 
 241
 This same reasoning applies, perforce, to the district court's refusal to disclose the street addresses of the prospective jurors. See Johnson v. United States, 270 F.2d 721, 724 (9th Cir. 1959), Cert. denied, 362 U.S. 937, 80 S.Ct. 759, 4 L.Ed.2d 751 (1960); Wagner v. United States, 264 F.2d 524, 527 (9th Cir.), Cert. denied, 360 U.S. 936, 79 S.Ct. 1459, 3 L.Ed.2d 1548 (1959); Hamer v. United States, 259 F.2d 274, 278-79 (9th Cir. 1958), Cert. denied, 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577 (1959). See also United States v. Borelli, 336 F.2d 376, 392 (2d Cir. 1964), Cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). I must say, however, that learning of the county of the prospective juror's residence is, at least in the Southern District of New York, to learn very little that may be helpful to the intelligent exercise of peremptory challenges. I would suggest that, if there are to be situations in which prospective jurors' names and addresses are withheld from the parties, jurors should be asked to disclose the "approximate community" in which they reside, Wagner v. United States, supra, 264 F.2d at 527, or the "particular portion of the district," Johnson v. United States, supra, 270 F.2d at 724.
 
 
 242
 Because the defendants were not told the names and addresses of the prospective jurors, however, the trial judge should have inquired, in reasonable fashion, into the jurors' ethnic and religious backgrounds. His failure to do so constituted error and requires reversal.
 
 
 243
 The trial judge was simply incorrect in his apparent belief that 28 U.S.C. § 1862[10] limits the permissible grounds on which a peremptory challenge may be exercised. It does not. See United States v. Price, 573 F.2d 356, 359-61 (5th Cir. 1978).[11] Peremptory challenges are expressly permitted under the statute. See 28 U.S.C. § 1866(c)(3); Fed.R.Crim.P. 24(b); Southern District Plan, Article VIII(3). And "(t)he essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." Swain v. Alabama, supra, 380 U.S. at 220, 85 S.Ct. at 836. Indeed, inquiry into the reasons prompting a defendant to exercise a peremptory challenge has been, and should be, "barred and foreclosed." United States v. Newman, supra, 549 F.2d at 245. And I believe we can take judicial notice of the fact that peremptory challenges are often exercised on the basis of a prospective juror's "race, religion, (or) nationality." Swain v. Alabama, supra, 380 U.S. at 220, 85 S.Ct. 824. Such a challenge is, simply put, the archetypical peremptory challenge.
 
 
 244
 For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. It is well known that these factors are widely explored during the Voir dire, by both prosecutor and accused . . . . (F)airness of trial by jury requires no less. . . . Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.
 
 
 245
 Swain v. Alabama, supra, 380 U.S. at 220-21, 85 S.Ct. at 836 (emphasis added) (citations and footnotes omitted). The result of allowing this system of challenge, of course, is that otherwise qualified jurors are eliminated from jury service "whether they be Negroes, Catholics, accountants or those with blue eyes." Id. at 212, 85 S.Ct. at 831. "In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause." Id. at 221, 85 S.Ct. at 836.[12] This does not sully the administration of justice in our court system. See Aldridge v. United States, supra, 283 U.S. at 314-15, 51 S.Ct. 470. Quite to the contrary, it extends to defendants the chance to act not only on the basis of sound and persuasive reasoning but also on the basis of "hunches" in rejecting people from the jury that will ultimately decide whether the defendant shall go free or stand convicted. It is a system both justified by experience and "full of . . . tenderness and humanity." Lewis v. United States, supra, 146 U.S. at 376, 13 S.Ct. 136, Quoting 4 Blackstone, Commentaries 353.
 
 
 246
 This is a unique case. The effect of the trial court's cluster of decisions regarding the conduct of the Voir dire was to make the Voir dire the only source of information about prospective jurors. Independent investigation was precluded. The information available to defense counsel was limited to that gleaned from the answers to the questions that Were asked. With the identities and addresses of the prospective jurors a mystery, I believe it was error to refuse to make reasonable inquiry into their ethnic and religious backgrounds. Given the nature and the importance of the peremptory challenge in our criminal system, and given the absence of persuasive countervailing considerations, I believe that that information was required to be disclosed in order for the defendants fully to exercise their right of peremptory challenge. The absence of that information unnecessarily restricted the exercise of that right.
 
 
 247
 For these reasons I would reverse the judgments of conviction and order a new trial; for these reasons I dissent.
 
 On Petition For Rehearing En Banc
 
 248
 A petition for rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for the Appellants, a poll of the judges in regular active service having been taken and there being no majority in favor thereof,
 
 Upon consideration thereof, it is
 
 249
 Ordered that said petition be and it hereby is DENIED.
 
 
 250
 OAKES, TIMBERS and MESKILL, Circuit Judges, voted to grant the petition limited to the propriety of the Voir dire examination. OAKES, Circuit Judge, reserves the right to file a memorandum.
 
 OAKES, Circuit Judge (dissenting):
 
 251
 I dissent from the denial of the petition for rehearing en banc.
 
 
 252
 The panel majority affirming the appellant's convictions adopted an entirely new rule of law that so far as I know stands without precedent in the history of Anglo-American jurisprudence. The panel majority's sanction of the trial of a defendant in a criminal prosecution before an anonymous petit jury, without disclosure of even the approximate community or neighborhood in which the jurors reside and absent requested inquiry into ethnic and religious backgrounds (much of which would be revealed by the usual name and address), strikes a Vermont judge as bizarre, almost Kafka-esque. It makes peremptory challenges for all practical purposes worthless,[1] to me a sorry state of affairs.
 
 
 253
 Judge Meskill's dissenting opinion, United States v. Barnes, 604 F.2d 168 (2d Cir. 1979), stands on its own feet. I would add only that so far as appears in the record no one had been threatened as the majority said, "no untoward event had occurred up to the opening of the trial," Id. at 137 and sequestration under protection would be an ample remedy if anyone had been. I note that no similarly anonymous jury drawing took place in any of the following cases, notwithstanding the notoriety of the defendants: Buchalter v. New York, 319 U.S. 427, 63 S.Ct. 1129, 87 L.Ed. 1492 (1973) (homicide trial of Murder, Inc.'s Louis "Lepke" Buchalter); United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960); United States v. Costello, 255 F.2d 876 (2d Cir.), Cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); Capone v. United States, 56 F.2d 927 (7th Cir.), Cert. denied, 286 U.S. 553, 52 S.Ct. 503, 76 L.Ed. 1288 (1932); People v. Luciano, 277 N.Y. 348, 14 N.E.2d 433, Cert. denied, 305 U.S. 620, 59 S.Ct. 81, 83 L.Ed. 396 (1938). It would seem to me that there were other less drastic alternatives available here including revelation of the jurors' identities in camera to counsel, See, e. g., United States v. Gurney, 558 F.2d 1202, 1210 n.12 (5th Cir. 1977) (jury listing, including addresses and other personal information, not publicly released), Cert. denied Miami Herald Pub. Co. v. Krentzman, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978); See also United States v. Hoffa, 367 F.2d 698, 710 (7th Cir. 1966) (jurors' names need not be read aloud in open court prior to voir dire), Vacated on other grounds, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967) (per curiam). I believe that the issue is of sufficient importance to be deserving of en banc treatment since judges in other narcotics cases are sure to follow its precedent as, to borrow a simile of Judge Timbers,[2] a flock of sea gulls follows a lobster boat. This case calls to mind Mr. Justice Holmes' dissent in Northern Securities Co. v. United States, 193 U.S. 197, 400-01, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904):
 
 
 254
 Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.
 
 
 255
 TIMBERS and MESKILL, Circuit Judges, concur in this opinion.
 
 
 
 [1]
 Hereinafter, "Fisher" will refer only to defendant Wallace Fisher. Any reference to Guy Fisher will include his full name
 
 
 [2]
 A "quarter", or "street quarter", refers to a quantity of approximately 4 grams of 1.5 percent pure heroin a package of ten sold to users of the drug. See Gov't Br. 5 n.*
 
 
 [3]
 As the Government points out,
 "The trial court was well aware, as is this Court, of the sordid history of attempts at influencing witnesses and jurors in cases such as these. See, E. g., United States v. Pacelli, 521 F.2d 135 (2d Cir. 1975) (Cert. denied, 424 U.S. 911, (96 S.Ct. 1106, 47 L.Ed.2d 314) (1976) (Pacelli, indicted for narcotics violations on the grand jury testimony of witness Parks, convicted of conspiracy to cause Parks' death)); Cf. United States ex rel. Lloyd v. Vincent, 520 F.2d 1272, 1275 (2d Cir. 1975) (Cert. denied 423 U.S. 937, (96 S.Ct. 296, 46 L.Ed.2d 269) (1975) (noting the peril surrounding the lines of narcotics agents; no error to close courtroom during agents' testimony))."
 Gov't Br. 66. See also United States v. Arroyo-Angulo, 580 F.2d 1137 (2d Cir. 1978) (in multi-defendant narcotics prosecution, no error to hold In camera hearings, without all defendants present, under circumstances of case, which included death threats made to cooperating witnesses).
 Furthermore, prior to trial, the Government, in its sequestration papers (11th Supp. Record on Appeal, Document No. 221, Envelope ordered sealed by district court), directed Judge Werker's attention to three recent Southern District cases in which there had been attempts to influence jurors: (1) United States v. Alvarez (Moten) was a 22-defendant narcotics case tried before Judge Owen. About six weeks into the trial, a defense attorney informed Judge Owen that a co-defendant had suggested the possibility of bribing a juror; later, the juror had approached a defendant's sister. The juror was replaced, and defendant Moten subsequently won the opportunity to interview other jurors in the hopes of obtaining a new trial. United States v. Moten, 582 F.2d 654 (2d Cir. 1978); United States v. Moten, 564 F.2d 620 (2d Cir.), Cert. denied, 434 U.S. 942, 959, 974, 98 S.Ct. 438, 489, 531, 54 L.Ed.2d 304, 318, 466 (1977); In re Grand Jury Subpoena served upon Doe, 551 F.2d 899 (2d Cir. 1977). (2) United States v. Stanzione, 391 F.Supp. 1201, (S.D.N.Y.1975), tried before Hon. Thomas P. Griesa, Jr., involved a juror who, during the course of deliberations in the second trial of the matter, suddenly suffered "chest pains", resulting in a mistrial. Judge Griesa thought the circumstances suspicious, and stated on the record that the juror might have been "reached"; (3) United States v. Tutino et al., 419 F.Supp. 246, (S.D.N.Y.1976), was a narcotics case before Judge Cooper. All of the defendants were acquitted, but the Government received information concerning contacts with jurors on behalf of certain of the defendants. The grand jury investigation that ensued was publicized as a result of articles in New York newspapers based on disclosures by witnesses who had testified before the grand jury.
 
 
 [4]
 Examples of the specific questions asked of those who were accepted as jurors are: "Can you tell us what your general attitude is toward black people?"; "Have you had any experience with any member of any race, creed or color other than your own which has resulted in any kind of civil or criminal confrontation in any court of law?"; "Have you any experience at your place of employment or residence or school which would make you feel you could not fairly judge a person of a different race, creed or color?"; "Are you in general prejudiced against persons of another race, creed or color so you feel that you could not fairly consider and decide this case on the evidence?" See Tr. 387-88 (Voir dire of No. 1 juror)
 
 
 [5]
 The following is a list of those finally selected: Nos. 97 (#1); 49 (#2); 138 (#3); 63 (#4), 104 (#5) (originally alternate #1); 24 (#6); 110 (#7); 141 (#8); 42 (#9); 146 (#10); 132 (#11) and 36 (#12). Of these jurors, five were black, one of the five alternates was Hispanic. The individual Voir dires of the panel members reveal a representative sampling. See Tr. pp. 385-92 (#1); 394-99 (#2); 145-50 (#3); 241-45 (#4); 485-90 (#5); 315-24 (#6); 478-83 (#7); 343-49 (#8); 245-53 (#9); 457-63 (#10); 463-69 (#11); and 426-33 (#12)
 
 
 [6]
 See note 3 Supra, detailing other Southern District cases in which intimidation had in fact occurred
 
 
 [7]
 Indeed, on the eve of trial, in September 1977, a potential witness Shepard Franklin, was reportedly murdered at the Harlem River Motors Garage the site of much of the trafficking in this case. (See Gov't Br. 106 n.*)
 
 
 [8]
 Aldridge was not founded on any federal constitutional underpinnings. However, the right of a state defendant to have questions asked concerning racial prejudice did assume constitutional proportions in Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), in which the Supreme Court held that a bearded black civil rights worker had been denied due process by the trial court's refusal to ask about racial prejudice. The Court found No constitutional error, however, in the trial court's refusal to ask about prejudice against bearded persons, and limited its holding to the facts of the case
 In Ristaino v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), the Supreme Court, limiting Ham, reversed the grant of a Writ of Habeas Corpus given to a black state prisoner convicted of robbing and assaulting a white security guard. The Writ had been awarded on the supposed authority of Ham, because the state trial judge had refused to ask veniremen about racial prejudice. The Supreme Court stated that "(t)he Constitution does not always entitle a defendant to have questions posed during Voir dire specifically directed to matters that conceivably might prejudice veniremen against him". Id. at 594, 96 S.Ct. at 1020, Citing Ham, supra, 409 U.S. at 527-28, 93 S.Ct. 848. The mere circumstances in Ristaino that the defendant was black and victim white were insufficient to Require, as a matter of constitutional law, the asking of specific racial prejudice oriented questions, because the state's obligation to supply an impartial jury could be satisfied by less than an inquiry into specific prejudice feared by a defendant. The Ristaino Court stated that the matter of Voir dire was properly within the trial judge's discretion because the " 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge' ". 424 U.S. at 594-95, 96 S.Ct. at 1020, Quoting Rideau v. Louisiana, 373 U.S. 723, 733, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting).
 It thus appears that the constitutional standard has coalesced with the Aldridge "fairness" standard.
 
 
 [9]
 In partial contrast, See United States v. Dellinger, 472 F.2d 340 (7th Cir. 1972), Cert. denied, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), in which the court approved broad (but not limitless) Voir dire. The case involved convictions of demonstrators under the federal Anti-Riot Act arising out of the events at the Democratic National Convention in Chicago. Though the defendants accepted the jury "under the greatest of protest", they argued that the Voir dire had been inadequate because it was too perfunctory to provide a basis for challenge and to permit selection of an impartial jury. The trial court had asked only Some of the potential jurors about prejudice resulting from employment by federal law enforcement agencies; also, the subject of "patriotism" was not covered; nor was inquiry made into the possibility of a conflict of values (and resulting prejudice) from the fact that the defendants wore long hair, beards, and "bizarre clothing" and that they might "seem to avoid the burdens and responsibilities of regular employment". 472 F.2d at 369
 The court rejected the prosecution's argument that Voir dire may be limited to matters falling within challenges for cause, and reversed the conviction on the ground that insufficient inquiry had been made under the circumstances of the case. According to the court, the right to exercise peremptory challenges would be an "empty one" unless the defendants, on request, were "permitted sufficient inquiry into the background and attitudes of the jurors to enable them to exercise intelligently their peremptory challenges". 472 F.2d at 368.
 Although the Dellinger decision suggests that the judge's discretion in conducting Voir dire should be broad, nonetheless reversal was mandated in the case because of the trial court's refusal to conduct inquiry into issues touching on the character of the defendants themselves issues which, on such a politically-charged question as arose from the events at the Convention, would surely inject themselves into the deliberations.
 
 
 [10]
 The literature (I. e., the articles) in this field has been amply cited by the appellants to support their theory that Any limitation on the Voir dire is improper. E.g., ABA Standards Relating to Trial by Jury § 2.2 (Approved Draft 1968); Babcock, Voir Dire: Preserving "Its Wonderful Power", 27 Stan.L.Rev. 545 (1975); Gutman, The Attorney-Conducted Voir Dire of Jurors: A Constitutional Right, 39 Brooklyn L.Rev. 290 (1972); Zeisel & Diamond, The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court, 30 Stan.L.Rev. 491 (1978); Note, Voir Dire: Establishing Minimum Standards to Facilitate the Exercise of Peremptory Challenges, 27 Stan.L.Rev. 1493 (1975); Note, Limiting the Peremptory Challenge: Representation of Groups on Petit Juries, 86 Yale L.J. 1715 (1977). A review of these articles and many, many more leaves the impression that the resolution of the issue before us depends not on any interpretation of law, but rather requires a judgment as to the proper accommodation between the need to protect jurors, the goal of promoting efficiency in the conduct of criminal trials without doing damage to the right of a criminal defendant to an unbiased and impartial jury, and the desire of the defendant to know as much as possible about those who sit in judgment on him. The literature does little to resolve the question; rather, depending on the slant of the author, each article offers a point of view on the best methods of conducting Voir dire. The slant of the articles cited by appellants, of course, is that the attorney should be able to ask what he will and to take full control of the jury selection process. Be that as it may, there are also many articles relating the abuses of attorney-controlled Voir dire, which suggest that a reasonable inquiry into the essentials raised in the particular case should be sufficient, and that the trial judge should retain the discretion to apply limits. E.g., Braswell, Voir Dire Use and Abuse, 7 Wake Forest L.Rev. 49 (1970); Levit, Nelson, Ball & Chernick, Expediting Voir Dire: An Empirical Study, 44 S.Cal.L.Rev. 916 (1971) (federal method, I. e., questioning controlled by judge, produces time savings without excessive abuse, and is preferred to other methods); Note, Judge Conducted Voir Dire As A Time-Saving Trial Technique, 2 Rutgers-Camden L.J. 161 (1970); Martin, Lawyers Speak The Truth About Counsel-Conducted Voir Dire (American Judicature Soc'y, 1970); Okun, Investigation of Jurors by Counsel: Its Impact On The Decisional Process, 56 Geo.L.J. 839 (1968) (background investigation of jurors may intimidate jury decision-making). See also Title, Voir Dire Examination of Jurors in Criminal Cases, 43 Calif. State Bar. J. 70 (1968) (describing California system, which limits voir dire to subjects about which there could be challenge for cause); Kallen, Peremptory Challenges Based On A Juror's Background: A Rational Use?, 13 Trial Lawyer's Guide 143 (1965) (little agreement between experienced trial lawyers about characteristics making jurors desirable); Plutchik & Schwartz, Jury Selection: Folklore Or Science?, 1 Crim.L.Bull. 3 (May 1965) (psychologists think that lawyers' "rules" for picking juries do not yield scientific results)
 
 
 [11]
 In capital cases, there is a statute that requires the disclosure of names and addresses of prospective jurors three days prior to trial. 18 U.S.C. § 3432. The statute is inapplicable to non-capital cases
 
 
 [12]
 Indeed, it might even be pointed out that the jury was selective in its decisions, acquitting two of the defendants entirely, acquitting defendant Barnes on three of the substantive counts, and failing to reach a verdict as to defendant Guy Fisher, while voting to convict as to the remaining charges and defendants. This is perhaps some indication that impartial debate was undertaken, the jury deciding the case on the evidence as it was shown to do. Accord, United States v. Haldeman, 181 U.S.App.D.C. 254, 283 n. 28, 559 F.2d 31, 60 n. 28 (1976) (en banc) (per curiam), Cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977)
 
 
 [13]
 26 U.S.C. § 6103(i)(1) reads as follows:
 (i) Disclosure to Federal officers or employees for administration of Federal laws not relating to tax administration.
 (1) Nontax criminal investigation.
 (A) Information from taxpayer. A return or taxpayer return information shall, pursuant to, and upon the grant of, an ex parte order by a Federal district court judge as provided by this paragraph, be open, but only to the extent necessary as provided in such order, to officers and employees of a Federal agency personally and directly engaged in and solely for their use in, preparation for any administrative or judicial proceeding (or investigation which may result in such a proceeding) pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party.
 (B) Application for order. The head of any Federal agency described in subparagraph (A) or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, or an Assistant Attorney General, may authorize an application to a Federal district court judge for the order referred to in subparagraph (A). Upon such application, such judge may grant such order if he determines on the basis of the facts submitted by the applicant that
 (i) there is reasonable cause to believe, based upon information believed to be reliable, that a specific criminal act has been committed;
 (ii) there is reason to believe that such return or return information is probative evidence of a matter in issue related to the commission of such criminal act; and
 (iii) the information sought to be disclosed cannot reasonably be obtained from any other source, unless it is determined that, notwithstanding the reasonable availability of the information from another source, the return or return information sought constitutes the most probative evidence of a matter in issue relating to the commission of such criminal act.
 However, the Secretary shall not disclose any return or return information under this paragraph if he determines and certifies to the court that such disclosure would identify a confidential informant or seriously impair a civil or criminal tax investigation.
 Further, subsection (4) of the same section provides for use of tax return information in judicial proceedings. It reads:
 (4) Use in judicial or administrative proceeding. Any return or return information obtained under paragraph (1), (2), or (3) may be entered into evidence in any administrative or judicial proceeding pertaining to enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or an agency described in paragraph (1)(A) is a party but, in the case of any return or return information obtained under paragraph (1), only if the court finds that such return or return information is probative of a matter in issue relevant in establishing the commission of a crime or the guilt of a party. However, any return or return information obtained under paragraph (1), (2), or (3) shall not be admitted into evidence in such proceeding if the Secretary determines and notifies the Attorney General or his delegate or the head of such agency that such admission would identify a confidential informant or seriously impair a civil or criminal tax investigation. The admission into evidence of any return or return information contrary to the provisions of this paragraph shall not, as such, constitute reversible error upon appeal of a judgment in such proceeding.
 
 
 [14]
 Defense counsel never actually offered to call Bellovin, according to the Government. (Gov't Br. 106 n. *). Bellovin was the only witness who could have linked the "Stepeney papers" to Stepeney or Franklin; it is thus doubtful that the testimony of Kukis or Martorell, both of whom lacked personal knowledge, was at all competent on the issues urged by defendants to be relevant
 
 
 [15]
 Some of the discrepancies are set forth in note 16, Infra
 
 
 [16]
 The Pavlick affidavit in support of the surveillance warrant had included a paragraph 25, which detailed information given by informant Geronimo, then known only as "Confidential Source Four". The paragraph stated that, on November 23, 1976, defendant Fisher had offered to arrange a sale of heroin to Geronimo, and that he had stated that the heroin was coming from defendant Rollock, who had (allegedly) told Fisher that the source was Barnes. On November 24, according to the affidavit, Geronimo and undercover Agent Diaz had talked with Fisher, who had again stated that the source of the heroin was Barnes. The affidavit also stated that the reliability of the statement was corroborated by a tape recording of the conversations. The transaction contemplated by the parties to the conversation (I. e., the Rollock transaction) occurred on November 29, and evidence concerning it was given at trial
 Both Geronimo and Agent Diaz testified at trial that they had met with Fisher on November 24, 1976, to arrange the transaction. On the tapes of the conversations, however, Fisher was shown not to have stated explicitly that "the source was Barnes"; rather, when Diaz had indicated that he would feel better if he knew that the heroin was coming from "Nicky", Fisher had responded that "it was through the same source". (See Tr. 4233-4234, Ex. 101). Again on November 29, Fisher apparently did not know the exact source, but he had agreed to check out Rollock's source and to meet with Diaz later that evening. According to Geronimo's testimony, Geronimo and Fisher had driven around between 5:00 and 8:15 that afternoon, returning to Diaz afterward. Geronimo stated that Fisher had then told Diaz that the heroin was coming from defendant Hayden, but that it was "more or less blessed by Barnes". (Tr. 2053-2055, 4243).
 Later in the trial, the defense had called another DEA Agent (Lawler), who had conducted a surveillance of Fisher on November 29. Lawler testified that, after Fisher had met with Diaz in the afternoon, Fisher had driven to the garage in an apartment complex in the Bronx and had parked. Lawler also stated that he had waited about one hour and had not seen the automobile leave.
 These are the circumstances underlying appellants' first contention as to the suppression issue. They argue that the Pavlick affidavit was misleading and incomplete, especially insofar as it omitted the facts brought to light by Lawler's testimony, which, it is contended, established that Geronimo had lied and was not as credible as Pavlick had represented.
 Appellants also cite the information given by informant Promise Bruce, then identified as "Confidential Source Five", who was on salary from the DEA prior to the "bug" application. Bruce's information had been incorporated into the Pavlick affidavit, but Bruce recanted in early March 1977, while the "bug" was still in operation pursuant to an extension order. The Government made the fact of Bruce's recantation known to the district court and to the defense, and, in fact, did not introduce tapes of interceptions made after Bruce's recantation.
 Appellants argue that, regardless of whether Pavlick knew that the Bruce information was false, Bruce should be considered a Government agent, whose perjury should vitiate the warrant. We do not think that this argument merits extended discussion. An informant, whether paid or not, is simply not a Government "agent" within the meaning of search and seizure law.
 
 
 [17]
 We leave for another day the resolution of the question whether suppression is appropriate if an affiant Intentionally misstates facts which are Immaterial to a finding of probable cause. Under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), it is clear that no remedy is required as a constitutional matter. Arguably, in an extreme case, allegations of deliberate misrepresentations on the part of Government agents may suggest the need for a hearing to determine whether the perjury infects the proper administration of justice. Such is not the case here, however, for nothing suggests that Agent Pavlick acted in deliberate disregard for the truth of the statements offered in support of the application for the bug. Although paragraph 25 of the Pavlick affidavit omitted to mention the conversation on November 29, during the transaction between Geronimo, Diaz, and Fisher, concerning the "source" of the drugs, it cannot be said that the statement that the heroin was "coming from Barnes" was misleading, vis-a-vis the necessity for the "bug", since the tape of the conversation on November 29 indicated that Fisher had stated that the heroin had been "blessed by . . . Nicky's (Barnes') people". This is not a case where a hearing is required
 As to appellants' argument, in a letter dated December 26, 1978, addressed to this court, concerning the need for a separate order authorizing entry into the Harlem River Motors Garage to install the "bug", we decline to reconsider our decision in United States v. Scafidi, 564 F.2d 633 (2d Cir. 1977), Cert. denied, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978). Furthermore, appellants' failure to raise the claim in the trial court bars their assertion thereof on appeal.
 
 
 [18]
 Gilbert and Sullivan, Mikado
 
 
 [19]
 See also Note, Resolution of the Multiple Conspiracies Issues Via a "Nature of the Enterprise" Analysis: The Resurrection of Agreement, 42 Brooklyn L.Rev. 243 (1975); Note, Federal Treatment of Multiple Conspiracies, 57 Colum.L.Rev. 387 (1957); and cases cited in United States v. Taylor, 562 F.2d 1345, 1350-54 (2d Cir.), Cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083; 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977)
 
 
 [20]
 Guy Fisher told Geronimo that a principal purpose for forming Kingdom Auto Leasing was to provide cars for Barnes' narcotics dealers in a manner which would prevent them from being forfeited if they were stopped by law enforcement officials with narcotics in them. (Tr. 1863-70)
 
 
 [21]
 The transcript of the state suppression hearing was properly considered under Rule 104(a) of the Federal Rules of Evidence. The fact that the same counsel represented Barnes in the state hearing as in the instant case, as well as the fact that the issue was the same, supported Judge Werker's decision. Barnes presented no new arguments to Judge Werker
 
 
 [22]
 Centeno was also charged with unlawful possession of a firearm (Count 6), but was acquitted on that count
 
 
 [23]
 The discussions concerning Hayden's counsel's possible desire to take the witness stand took place in the trial court's chambers and were transcribed by the court reporter. Judge Werker ordered that the transcripts be sealed. Because the Government does not oppose the defense motion to unseal these pages, we have granted the motion as to Tr. 1965-76, 1999-2007, 2103-7. The transcripts of these discussions do not reveal any facts which would change the conclusion we have reached
 
 
 [24]
 21 U.S.C. § 881(a)(4); 49 U.S.C. § 781(a)
 
 
 [1]
 On the Voir dire, the prospective jurors were asked to disclose in which of the eleven counties of the Southern District they lived
 
 
 [2]
 The government had moved that the jury be sequestered. There is no appeal from this decision
 
 
 [3]
 Although the trial judge did not refer to it, this statement appears to be based on 28 U.S.C. § 1862, which provides as follows:
 No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status.
 
 
 [4]
 When one of the attorneys suggested that, based on the sequestration order and the restriction regarding names and addresses, jurors would infer the "real" reason for the judge's decisions, namely, that the judge and the government believed that the jurors and their families might somehow be in danger because of their serving on the jury, the judge responded: "It has nothing to do with any real reason. I just do not want them interfered with, their privacy interfered with." When the judge told the prospective jurors that they were not to disclose their names and addresses and that the petit jury would be sequestered during the course of the trial, he explained that his decisions were based on the likelihood of extensive publicity regarding the trial, the possibility that the media would attempt to interview members of the jurors' families, and the desire to protect not only the impartiality of the jurors' deliberations but also the privacy of the jurors and their families
 Ironically, the majority opinion is itself substantial evidence of how difficult it might have been for the jurors to resist an inference as to the "real" reason for the decisions regarding juror names, addresses, and sequestration. The opinion is based largely on the "sordid" and all-too-often violent history of multi-defendant narcotics trials in the Southern District and the conclusion that the safety of the jurors and their families would have been in serious jeopardy but for measures guaranteeing juror anonymity.
 
 
 [5]
 "(L)ike every other discretion, this one may be abused, and . . . it is then subject to review." United States v. Dennis, 183 F.2d 201, 228 (2d Cir. 1950), Aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). See also The Jury System in the Federal Courts, Report of the Judicial Conference Committee on the Operation of the Jury System, The Voir Dire Examination and Impanelling of the Jury, 26 F.R.D. 409, 465-66 (Approved by the Judicial Conference 1960). Cf. United States v. Halper, 590 F.2d 422, 428 (2d Cir. 1978) ("as with any power assigned to the discretion of the district court, there are limits, either express or implied, to its exercise"). It is Judge Magruder's definition of "abuse of discretion" that this Circuit has chosen to follow in cases such as this one:
 "Abuse of discretion" is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.
 In re Josephson, 218 F.2d 174, 182 (1st Cir. 1954). See Wong Wing Hang v. I.N.S., 360 F.2d 715, 718-19 (2d Cir. 1966); Carroll v. American Federation of Musicians, 295 F.2d 484, 488 (2d Cir. 1961). Compare Delno v. Market St. Ry., 124 F.2d 965, 967 (9th Cir. 1942); Finley v. Parvin/Dohrmann Company, Inc., 520 F.2d 386, 390-91 (2d Cir. 1975) (unique policies surrounding appeals from dismissals or refusals to dismiss under Fed.R.Civ.P. 41(b)).
 Here, the record reveals that the trial judge exercised very little discretion. He simply announced what his decisions were, without having heard or requested oral or written argument from the attorneys, and immediately closed off discussion relating to those decisions. It can hardly be said that he "weigh(ed) . . . the relevant factors."
 
 
 [6]
 It appears that the trial judge in this case acted under this very assumption, asking as he did a number of questions relating to marital status, number of children, occupation, occupation of family members and friends, educational background, membership in groups, clubs or fraternal organizations, past jury experience, and past involvement in legal disputes. Presumably not all of these were aimed at disclosing information which would provide the basis for "for cause" challenges only
 
 
 [7]
 The Voir dire is not always the only way that information about prospective jurors can be obtained by the parties. One other way is to conduct an independent investigation. See, e. g., United States v. Falange, 426 F.2d 930 (2d Cir.), Cert. denied, 400 U.S. 906, 91 S.Ct. 149, 27 L.Ed.2d 144 (1970) (government investigation of prospective jurors with the aid of the F.B.I., local police departments, and credit bureaus); United States v. Costello, 255 F.2d 876 (2d Cir.), Cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958) (government investigation of income tax records of panel members); But see Kiernan v. Van Schaik, 347 F.2d 775, 780 & n.9 (3d Cir. 1965); See generally Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan.L.Rev. 545, 558-63 (1975). Here, independent investigation of the prospective jurors was not only impossible because of the jurors' anonymity but expressly prohibited by the trial judge. In such circumstances, the Voir dire takes on added importance
 
 
 [8]
 It appears well settled that it is within the trial court's discretion to withhold the list of prospective jurors until the day proceedings begin. See, e. g., United States v. Scallion, 533 F.2d 903, 913-14 (5th Cir. 1976), Cert. denied, 429 U.S. 1079, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977); United States v. Hoffa, 367 F.2d 698, 710 (7th Cir. 1966), Vacated on other grounds, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967). The protection of jurors' privacy in cases involving a great deal of publicity is a permissible reason for doing so. See, e. g., United States v. Gurney, 558 F.2d 1202, 1210, n.12 (5th Cir. 1977), Cert. denied, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978)
 
 
 [9]
 See note 7, Supra
 
 
 [10]
 See note 3, Supra, and accompanying text
 
 
 [11]
 Nor does the requirement that the petit jury be "selected from a fair cross section of the community," see Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), limit the permissible grounds on which peremptory challenges may be made by a defendant. Here, the jury was quite plainly "selected from" a source fairly representative of the community the composition of the jury wheels, pools of names, panels or venires from which the jury was drawn is not challenged. See Taylor v. Louisiana, supra, 419 U.S. at 538, 95 S.Ct. 692; United States v. Jenkins, 496 F.2d 57, 65 (2d Cir. 1974), Cert. denied, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975)
 
 
 [12]
 There are cases that uphold the refusal by a trial judge to inquire into the religion of a prospective juror. See, e. g., Gold v. United States, 378 F.2d 588, 594 (9th Cir. 1967); Pope v. United States, 372 F.2d 710, 726-27 (8th Cir. 1967), Vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); Yarborough v. United States, 230 F.2d 56, 63 (4th Cir.), Cert. denied, 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487 (1956). But see Aldridge v. United States, supra, 283 U.S. at 313, 51 S.Ct. 470; Miles v. United States, 103 U.S. 304, 309-11, 26 L.Ed. 481 (1880). Here, the trial judge not only refused to inquire into the religious backgrounds of prospective jurors but also refused to inquire into their names, addresses and ethnic backgrounds
 
 
 [1]
 See Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan.L.Rev. 545, 554 (1975)
 
 
 [2]
 Lanza v. Drexel & Co., 479 F.2d 1277, 1321 n. 2 (2d Cir. 1973) (en banc)